**JOHN T. JONES CONSTRUCTION CO., Plaintiff/Counterclaim Defendant,**

v.

**HOOT GENERAL CONSTRUCTION, Defendant,**

Des Moines Metropolitan Wastewater Reclamation Authority; and Black & Veatch Corp., Defendants/Counterclaimants.

Hoot General Construction Company, Inc., Third–Party Plaintiff,

v.

Black & Veatch Corporation, Third–Party Defendant.

Des Moines Metropolitan Wastewater Reclamation Authority, Cross–Claimant,

v.

Black & Veatch Corporation, Cross–Claim Defendant.

Black & Veatch Corporation, Cross–Claimant,

v.

Hoot General Construction Company, Inc., Cross–Claim Defendant.

No. 4:05–cv–00525–RAW.

United States District Court, S.D. Iowa, Central Division.

March 6, 2008.

984

Jeffrey Dean Stone, Stephen D. Marso, Whitfield & Eddy, PLC, West Des Moines, IA, for Plaintiff/Counterclaim Defendant.

Kevin H. Collins, Kevin J. Caster, Shuttleworth & Ingersoll, Cedar Rapids, IA, for Defendants and Third–Party Plaintiff/Cross–Claim Defendant.

James E. Brick, Brick Gentry Bowers Swartz Stoltze & Levis PC, West Des Moines, IA, for Third–Party Plaintiff, and Cross–Claim Defendant.

Debra Rectenbaugh Pettit, William J. Koehn, Davis Brown Koehn Shors & Roberts, Des Moines, IA, for Defendants/Counter-claimants and Third–Party Defendant/Cross–Claim Defendant.

Mark Godwin, Des Moines City Attorney, Susan A. Low, City of Des Moines Legal Dept., Des Moines, IA, for Defendants/Counter-claimants and Cross–Claimant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, RULING ON MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND ORDER FOR JUDGMENT

ROSS A. WALTERS, United States Magistrate Judge.

Plaintiff John T. Jones Construction Co. ("Jones") was the general contractor for a public improvement project at defendant Des Moines Metropolitan Wastewater Reclamation Authority's ("WRA") Wastewater Reclamation Facility ("WRF"). The project was the "WRF Combined Hauled Waste/Solids Processing Improvements"("the project" or the "WRA project"). (Ex. 48 at 4). The project included a lining system to protect the concrete in "blended sludge wetwells, a new waste-to-digester" wetwell and septage tanks which were to be rehabilitated to serve as "special waste receiving tanks." This lawsuit is about which of two competing lining systems should have been installed. It involves claims, counterclaims and cross-claims between Jones, WRA, Black & Veatch ("B&V"), an international construction and engineering firm hired by the City of Des Moines[1] to provide engineering services for the design, bidding and construction of the project, and Hoot Gen-

---

1. The City of Des Moines was a defendant early on but was dismissed by plaintiff in December 2005.

eral Construction Co. ("Hoot"), the initial concrete lining subcontractor hired by Jones.

The claims of the parties and history of proceedings were discussed at length in an August 8, 2007 ruling on the parties' motions and cross-motions for summary judgment ("the August 8 ruling"). The August 8 ruling left the following claims to be tried: Jones' claims of breach of contract (Count VI), common law indemnity (Count VII) and promissory estoppel (Count XII) against Hoot; Jones' claims of breach of contract (Count I) and breach of the duty of good faith and fair dealing (Count II) against WRA; Jones' claims of intentional interference with contract (Count VIII), negligent misrepresentation (Count X) and professional negligence (Count XI) against B&V; Hoot's claims of intentional interference with contract (Count I) and professional negligence (Count III) against B&V; WRA's counterclaim against Jones for breach of contract and breach of the duty of good faith and fair dealing; WRA's cross-claim against B&V for indemnity (Counts I through VI); and B&V's counterclaim against Jones for contribution on Hoot's claims against B&V and cross-claim against Hoot for contribution on Jones' claims against B&V.

The Court has diversity jurisdiction. 28 U.S.C. § 1332(a). The case came on for bench trial before the undersigned on August 20 through 24, 2007 pursuant to 28 U.S.C. § 636(c). Posttrial written arguments and motions for judgment as a matter of law have been filed and the case is now fully submitted.

The Court has carefully considered the record evidence, the post-trial written arguments and motions for judgment as a matter of law, and now finds and concludes as follows on the issues presented.

## I.

## FACTUAL BACKGROUND AND FINDINGS

### A. *Concrete Corrosion, The Competing Lining Systems, and Testing*

To better understand the issues and background facts in this case it is appropriate to start by discussing why concrete exposed to wastewater needs to be protected and moving from there to a comparison of the two lining systems at issue and the testing to which they have been subjected. John A. Redner retired in 2004 as head of the "Sewerage" Department for the County Sanitation Districts of Los Angeles County. He has extensive experience in protecting wastewater collection systems from the corrosive effect of wastewater, and is a recognized leading expert on the subject. Jones called Mr. Redner to give expert testimony. According to Mr. Redner, as wastewater stays in a collection system, it becomes septic and gives off hydrogen sulfide gas. Bacteria break down the hydrogen sulfide gas and consume the hydrogen sulfide. A byproduct of this process is sulfuric acid. Most wastewater collection systems, including WRA's, are constructed of concrete. Sulfuric acid corrodes concrete. How to protect concrete wastewater collection systems from corrosion has been a subject of study for decades. The issue became acute when in about 1987 the federal Environmental Protection Agency adopted new regulations which required industries to remove heavy metals from wastewater. The removal of heavy metals had the unfortunate effect of improving the wastewater environment for the growth of bacteria, the net effect of which was a significant increase in the production of sulfuric acid and accompanying marked acceleration in the corrosion rate of concrete wastewater structures.

Coatings of various kinds provide a measure of protection, but used alone tend to degrade and fail over time which had, in fact, been WRA's experience with coal tar epoxy coatings. The most consistently successful protective methods involve attachment of an impervious polyvinyl chloride (PVC) liner to the concrete surface. PVC liners for new concrete structures have been available for years.[2] It has been within about the past twenty years that lining systems have evolved to protect rehabilitated existing concrete collection structures. As relevant in this case, the rehabilitation and protection of an existing structure involves first repair of the corroded concrete surface (for example by sand- or waterblasting, with the application of shot crete if more severely damaged) followed by the application of a bonding material or "mastic" to the repaired concrete surface to which is affixed a PVC liner. In 2002 two companies offered PVC/mastic lining systems for rehabilitated concrete wastewater structures— Ameron International Corp. ("Ameron"), and Linabond, Inc. ("Linabond"). (Ex. 195 at 4).[3] As events would develop, the competing lining systems proposed for use on the WRA project were Ameron's "Arrow–Lock" system and Linabond's "Semi–Rigid Co–Lining" system.

Arrow–Lock uses an epoxy mastic and PVC sheets with ribbed, arrow-shaped anchors on the inside face. The PVC sheets are mechanically locked in place by rolling the anchors into the mastic before it cures. Weld strips are fused at the seams of the PVC sheets using hot air. Linabond's co-lining system uses a structural polymer mastic with, in this case, a semi-rigid PVC lining which is chemically bonded[4] to the structural polymer. Polyurethane seam material is used to seal the joints. The first installation of both of these systems occurred in the mid–1990's. While both were designed to rehabilitate corroded concrete structures, both could be used on new construction.[5]

The record is replete with references to two kinds of tests for coatings and liners generally accepted as standards in the wastewater treatment community. The first is the "pickle jar" test, developed and conducted by the City of Los Angeles. Since the 1940's and '50's the City has been involved in testing materials for use in wastewater treatment systems. The manufacturer of the product being tested, usually a coating, supplies test "coupons"

**2.** See note 5 infra.

**3.** A third company, Agru America, Inc., offered a lining system, Agru Sure Grip, which when applied to an existing structure utilized a high-density polyethylene lining mechanically anchored to a cement-based grout. While Agru Sure Grip could be used on rehabilitated structures with the use of forms, Mr. Redner testified it was typically used in new construction. (See Ex. 195 at 4–5).

**4.** There are references in the record to the Linabond liner being "glued" on. As the Court understands the testimony of Mr. German Gilli, Linabond's director of research and development and vice president, Mr. Redner's report and accompanying materials, and the testimony of B&V engineer Amy Kliewer,

the chemical bond does not rely on glue or an adhesive. Rather a "surface activator" is used to affect the molecular structure of the PVC sheets resulting in a molecular, or chemical bond between the PVC sheets and the structural polymer which is stronger than typical adhesives. (See Gilli Depo., Ex. 217 at 20; Ex. 195 at 11, 54, 373).

**5.** Ameron also manufactures a "T–Lock" system for use on new concrete structures. T–Lock was introduced in 1947 and now has a 60–year history of providing good service. The T–Lock system employs a PVC sheet with ribbed, T-shaped anchors on the inside face which are embedded or rolled into the new concrete before it cures. The T–Lock sheets are thus fastened directly to the concrete. There is no intervening mastic.

which are immersed in solutions of chemicals typically found in wastewater for a period of up to 112 days. The coupons are checked every twenty-eight days for changes in their properties. Some coatings, however, passed the pickle jar test but failed in use. Los Angeles sanitation officials under Mr. Redner's leadership developed an auxiliary test to gauge the performance of protective coating and lining systems to sulfuric acid exposure over a period of one year. Some ninety-plus products or systems had, as of 2002, been subjected to what has come to be known as the Redner test. The results of the tests were summarized in an August 2002 report authored by Mr. Redner and other engineers associated with the sanitation districts of Los Angeles County (the "Redner report"). (Ex. 195 at 310–44). Both Ameron's Arrow–Lock PVC liner and Linabond's PVC liner with its structural polymer system passed the Redner test. (*Id.* at 321, 322, 332).[6] Both had the best possible score for acid resistance and "concrete bond," though Linabond did not score as well on "application." While the Arrow–Lock liner passed the Redner test, the mastic used in the Arrow–Lock system has not been tested. The Linabond structural polymer mastic has passed the pickle jar test.

## B. *The Course of Events*

On December 3, 2001, the City of Des Moines entered into an Agreement for Professional Services (the "professional services agreement") with B&V to review the WRF and design the project.[7] (Ex. 197). The scope of B&V's professional services was initially limited to engineering services for the design and bidding of the project. (Ex. 197 at 20). It was later expanded to include bid and pre-award services, and project administration and control. (*Id.* at 37–54). Part of the latter included review of submittals from the general contractor.

B&V operates on a team model or project workflow basis. In 2002 B&V's internal design team on the concrete lining portion of the WRF project included project manager Matt Bond, project engineer Amy Kliewer,[8] design engineer Lucas Botero, and a summer intern, Melantha Herron. In discussions with WRA the team learned from Michael Hall, a City of Des Moines civil engineer involved in managing waste collection systems and major treatment projects, that prior to 2002 the City had used primarily coal tar epoxy coatings on concrete pipe and in some structures. The coatings delaminated and failed, even after reapplication, causing severe deterioration of the concrete pipes and structures. WRA told B&V that it did not want to have to deal with the deterioration problem again as there was limited access to the in-ground tanks and there would be regular delivery of a large volume of hauled waste. This concern was heightened by the fact the existing septage tanks were to be rehabilitated to serve as special waste tanks. (Ex. 6 at 1). The system was to handle not only waste from the sewer system, but hauled waste

---

6. The precursors to the Linabond system at issue did not pass the Redner test. (Ex. 195 at 320–21, 329, 331).

7. The City subsequently transferred all responsibility for the project to the WRA on May 17, 2004 and the professional services agreement with B&V was assumed by WRA on July 1, 2004. (Ex. WRA 8). The WRA is a special purpose public entity organized and existing under Chapters 28E and 28F of the Iowa Code. As successor to the City on the project the Court has considered WRA as a party to the professional services agreement and interchangeable with the City as far as the facts of the case are concerned.

8. During the project Mr. Bond left B&V and Ms. Kliewer took over his duties, although she testified her title remained the same.

brought in by truck from other communities, "port-a-potties," and industrial waste. The industrial waste was expected to be high-strength and high in suspended solids with wide pH swings. As a result B&V anticipated the "physical, chemical and bacteriological characteristics" of the "special" waste would not be uniform and would be "very aggressive," necessitating adequate protection from corrosion. (Id.)

In June 2002 Ms. Herron was given the task of researching lining systems for the rehabilitated tanks. She spoke with a B&V chief engineer, Jack Ory, to gain direction. Mr. Ory testified he met with Herron, but did not have enough information about the job to give her more help at the time. He did tell her she should obtain information about the type of products available and see what vendors of those products would recommend. He wrote down the names of several products and reputable manufacturers. Mr. Ory gave the list to Ms. Herron. (Ex. 4). Among the products he listed was "T–Lock lining by Ameron." Mr. Ory understood that Ms. Herron was asking about lining for an existing tank and told her Ameron's T–Lock system was typically for new construction, but they might have something else. Mr. Ory also had in his possession an envelope of materials from Linabond which he gave to Ms. Herron. Mr. Ory had the Linabond information because he received and kept literature from vendors about products he thought might be useful. He testified it was common practice to utilize vendors and manufacturers as resources for available products and their specifications. In a later, June 25, 2002 e-mail to Ms. Herron, Mr. Ory outlined information that would be important for her to obtain in the course of her research. (Ex. 3).

Precisely what Ms. Herron did to research lining systems is unclear because she did not testify. The copy of the June 25 e-mail in the record has handwritten notes on it, presumably by Ms. Herron, which include a reference to Linabond and a number for Anna Pingel, Linabond's Chief Financial Officer at the time. (Ex. 3). Apparently Ms. Herron got hold of Pingel immediately after receiving the June 25 e-mail from Mr. Ory as evidenced by Pingel's follow-up e-mail to Ms. Herron about two hours after Ory's e-mail. (Compare Ex. 5 at 6–7 with Ex. 3). Ms. Pingel thanked Ms. Herron for contacting Linabond and directed her to a private website for more information concerning the company's products. (Ex. 5 at 6–7). She also attached additional information concerning Linabond's three "co-lining" systems and invited Herron to send more information to facilitate a recommendation from Linabond. (Id. at 8).

In the next few days Ms. Herron and Ms. Pingel exchanged more information about the project and about Linabond. (Ex. 5 at 4–6). In a July 2, 2002 e-mail Ms. Herron asked about price estimates and whether a Linabond representative might be available in the Des Moines area to view the tanks. (Id. at 4). Ms. Pingel responded with further questions about the project. On July 9, Ms. Pingel and Ms. Herron exchanged information about use of an anchoring system. On July 11 Herron queried Pingel about Linabond's warranty information.

On July 12, 2002, Ms. Kliewer sent a memorandum to Mr. Hall and other WRA representatives recommending installation of the Linabond co-lining system "with a supplementary anchoring mechanism above the water line" for the existing tanks to be rehabilitated, noting her recommendation could also be applied to "other structures requiring corrosion protection measures." (Ex. 6 at 1–2). The memorandum had been drafted through the joint efforts of Ms. Herron and Mr.

Botero. Ms. Kliewer reviewed and edited the memorandum, but the research was entirely Ms. Herron's. The memorandum contained information about several lining and coating systems, application methods, environments in which the products had been used, the time needed for installation, and surface preparation. Three lining systems were presented for consideration. Linabond's co-lining system and an Ameron urethane lining system which had reportedly been used for chemical and petrochemical storage tanks were two of these.[9] Because of the high level of oil and grease existing on the tank walls the memorandum recommended a lining system with "a combination of chemical bonding agents and physical anchors," adding that most manufacturers "do not approve the idea of mechanically anchored systems because of their previous experiences" but "do not object to installing an anchoring system above the maximum surface water elevation." (*Id.* at 6). WRA ultimately accepted the recommendation.

The July 12 memorandum also "strongly recommend[ed]" that the manufacturer visit the site "to assess the tanks' conditions and discuss the surface preparation to be used." (Ex. 6 at 3). The tanks were inspected by Linabond's representative, Dave Ahern, on July 26, 2002. As a result of the field inspection and based on the extent of corrosion in the tanks, Linabond's research and development director, German Gilli, recommended to B&V that Linabond's "Semi–Rigid PVC" co-lining system be used for all tanks. (Ex. 7 at 1). Mr. Botero forwarded Mr. Gilli's recommendation and attached sample specification to Kliewer. (Ex. 8).

Over a year went by before the liner design was revisited. On October 7, 2003, B&V submitted a project Design Memorandum to WRA which proposed existing tanks and wetwells would be rehabilitated with a "combination of a sheet liner with a coating system." (Ex. 11 at 4, 6, 15–16). B&V began to prepare drawings and specifications for the contract documents. On November 13, 2003, Mr. Botero contacted Wayne Kerns, a corrosion specialist and product specifications archivist at B&V. Mr. Botero told Mr. Kerns that B&V would be specifying "a co-lining system (Linabond)" for the Des Moines project. He asked for a copy of a "Flexible Protective Co–Lining System" "cut file" in B&V's records. (Ex. 12 at 1). In B&V's system a "cut file" is a nonstandard specification which has been used on another B&V project. Mr. Kerns provided Mr. Botero with a "tentative guide specification" for a Linabond flexible co-lining system. The specification had been drafted by Mr. Jon Ardahl in 1996. (*Id.* at 2–15). Mr. Ardahl was at the time a member of B&V's specification department.[10] Paragraph 5 of the cut file specification stated "[t]he co-lining system shall be Linabond "Vinylthane Co–Lining System" and "[n]o substitutions or alternatives will be permitted."" (*Id.* at 7). The specification was thus a "sole source" Linabond specification, that is, a specification which specified the manufacturer of the product to be installed.

9. Ms. Herron must therefore have obtained some information about Ameron products, though evidently not Arrow–Lock or T–Lock. She probably did not contact an Ameron representative. Had she done so, surely she would have been told about Arrow–Lock because Arrow–Lock was specifically designed for rehabilitated concrete structures like those involved in the WRA project. For the same reason, had Ms. Herron come across Arrow–Lock she undoubtedly would have included it in the memorandum.

10. According to Ms. Kliewer there is a difference between a cut file and a guide specification, though Mr. Ardahl referred to the guide specification as a "cut file" in his testimony. Any distinction is not material here.

On November 25, 2003, Mr. Botero contacted Linabond's Mark Bertram for additional information. (Ex. 13). Mr. Botero sent B&V's Linabond cut file specification to Mr. Bertram for review. Mr. Bertram responded with an updated sample sole source specification for Linabond's semi-rigid co-lining system. (Ex. 14 at 3–8). With the in-house cut file specification and Linabond's updated specification in hand, Mr. Botero put together a draft lining specification for the WRA project. His draft specification was reviewed and certified by Ms. Kliewer.

On December 16, 2003, another B&V design engineer, Scott Aurit, e-mailed B&V's draft lining specification to Mr. Bertram with a request for a review and comment. (Ex. 15 at 3). On January 8, 2004, Ms. Pingel sent Mr. Botero the most recent Linabond sample specification to review and said Mr. Gilli would call the next day. Mr. Botero believes he made changes to the specification based on the information provided by Ms. Pingel. (Ex. 16).

The end result of all this was Section 09887 of the project specifications entitled "Protective Co–Lining System." (Ex. 18; Ex. 48 at 407–15; Ex. 49 at 8–16). The specification called for a protective "co-lining" system to be applied to the interior concrete surfaces of all of the project's wetwells and tanks. It is necessary to review the specification in some detail. Section 6 captioned "MATERIALS" stipulated the "co-lining system shall be Linabond 'Semi–Rigid Co–Lining System' manufactured by Linabond Inc., *or equal*." (Ex. 18 at 3 (emphasis added)). The same section went on to specify "[c]o-lining

[m]aterials" ... "if approved by the lining manufacturer." (*Id.*) These included a structural polymer mastic which was to be resistant to "weathering, aging, dilute (10 per cent) solutions of sulfuric acid and intermittent wetting by raw sewage." (*Id.*) The sulfuric acid solution to which the mastic was to be resistant was the same employed in the Redner test. (Ex. 195 at 312). Subsection 6.01 described the physical properties of the liner.

Section 4 of the specification required the "lining" to meet conditions of service with reference to exposure to specified chemical solutions, chief among which was a solution of 20 per cent sulfuric acid. (Ex. 18 at 2). The chemical solutions were essentially the pickle jar test chemicals.

Section 9 of the specification dealt with the application of the lining system. The system was to "consist of a semi-rigid liner bonded with a surface activator to a structural polymer mastic that is bonded with an epoxy/urethane primer to the concrete surface." (Ex. 18 at 5). At vertical seams the liner sheets were to be overlapped at least four inches and "fully bonded in the mastic to the adjoining liner sheet." (*Id.* at 7).

Except for the conditions of service, all of the particulars of the specification discussed above were peculiar to Linabond's patented co-lining system.[11]

Throughout the development of the specification, and later when considering submittals from general contractor Jones, B&V's engineers viewed the term "co-lining" as a generic description of a type of lining system with a PVC liner attached to a coating or mastic applied over the con-

---

11. Section 9 of the specification also provided, as Ms. Kliewer's July 12, 2002 memorandum had recommended, that above the maximum surface water elevation of each tank the co-lining system would have an additional mechanical anchoring system—anchor bolts—for additional support, a sort of belt and two suspenders approach (PVC liner, mastic, and mechanical anchors). (Ex. 18 at 6). This requirement was eventually abandoned as unnecessary.

crete substrate which afforded two levels of protection (a "co-lined system" as referred to in Ms. Kliewer's original July 12, 2002 lining memorandum (Ex. 6 at 2)). "Co-lining" is actually a proprietary trademark for Linabond's lining system and is not an engineering term used in the industry.[12] The "Co" in co-lining signifies a covalently bonded liner, that is, a type of chemical bond. The structural polymer mastic was not intended to afford standalone protection though it was resistant to acid and sulfide and would provide a measure of protection if the liner was compromised until the liner could be repaired.

As originally drafted by B&V the specification was a "sole source" specification like that in the cut file and Linabond's sample specifications in that it specified only Linabond's product. The "or equal" language italicized above was added at the request of WRA which preferred to have as few sole source specifications as possible. The request was not controversial with B&V. Ms. Kliewer testified B&V did not know that there were no other manufacturers who could meet the lining specification and that an or-equal would be considered was already provided for in the "front end" provisions of the general contract. As the Court understands it, the front end provisions Ms. Kliewer was referring to were those which stipulated the project would be constructed in accordance with the Urban Standard Specifications for Public Improvements Manual ("Urban Standards"), a uniform set of specifications for public improvements, as modified by "supplemental specifications and special provisions" specific to the project ("specific project requirements"). (Ex. 48 at 28). The Urban Standards instructed that when a "manufacturer's name, brand or model is mentioned, it is to be understood that the words equivalent or equal are

assumed to follow . . . whether or not they do in fact. . . ." (Exs. WRA 1 at 12; 48 at 305). Similarly, the specific project requirements advised that "[w]henever the names of proprietary products or the names of particular manufacturers, or vendors are used, it shall be understood that the words 'or equal' following the enumeration, if not specifically stated, are implied." (Ex. 48 at 227). The same section also stated that "[w]henever a material or article is specified or described by using the name of a proprietary product or the name of a particular manufacturer or vendor, the specified item shall be understood as establishing the type, function and quality desired." (*Id.*)

In March 2004 the City notified potential bidders of the project. Bidding documents made available to prospective bidders included plans, drawings and specifications from the general contract, and by reference the Urban Standards. (Ex. 48 at 26, 134). The project, plans and specifications were publicly advertised. (*Id.*) Bids were due April 20, 2004. (*Id.* at 26; Ex. 23 at 1).

John T. Jones Construction Company of Fargo, North Dakota, is a general contractor which in the past twenty years has almost exclusively worked on wastewater projects. Jones is a lowcost bidder. It is owned by brothers Jeff Jones and John B. Jones. While the company itself does some dirt, concrete and pipe work, typically most of the work on its projects is performed by subcontractors. John B. Jones is the company's president, Jeff Jones its CEO. John Jones is in charge of estimating. Jeff Jones takes charge of the projects after they are awarded to the company. John Jones was assisted in estimating the WRA project by Scott Nath, a Jones project engineer and estimator.

12. B&V's engineers would have known this had they paid attention to the trademark signals in Linabond's product literature, but they appear not to have noticed.

Mr. Nath was responsible for the concrete liner part of Jones' bid for the WRA project. He also served as Jones' project manager on the project.

While Mr. John Jones had many years of experience bidding projects, the WRA project was Mr. Nath's second job as a project manager for Jones. Neither was an expert on concrete lining, was familiar with Linabond's products, or was acquainted with the differences between the Linabond and Ameron lining systems. Mr. John Jones testified the company relied on subcontractors to bid the appropriate products for a project. The time factor involved in bidding also necessitated reliance on subcontractors because most subcontractor bids came in at the eleventh hour just before the general contractor's bid was due, a common practice which discouraged general contractors from bid shopping. Typically Jones did not go over subcontractor bids in detail, looking only at the scope, price and whether there were any exclusions such as "subject to engineer's approval." Jones did not take bids with exclusions.

A project pre-bid conference was held in Des Moines on March 18, 2004, at which B&V reviewed the bidding documents and procedures, explained the contract specifications, including that substitutions would not be evaluated during the bid phase, gave a plant tour, and answered general questions. (Ex. 48 at 103–106). No representative of Jones attended. (*Id.* at 107). Jones did not submit to B&V any pre-bid requests for clarifications or interpretations of the contract specifications. It did,

however, have the bidding documents in hand. (*Id.* at 134–35). No bidder raised any questions about the liner specification. (*Id.* at 103–106).

Mr. Nath called Phil Hoot, president of Hoot General Construction Company of Houston, Texas, to see if Hoot would be interested in bidding the lining work on the project. Hoot has been a certified Ameron concrete lining installer for over twenty-five years and usually works as a subcontractor on public projects. In 2003 Jones employed Hoot to install Ameron T-Lock on new concrete structures at a wastewater treatment plant project in Springfield, Missouri.[13] (Exs. HC 5 at 11–13; 9, 10, 69). B&V was the project engineer though neither Ms. Kliewer nor Mr. Botero were involved with Springfield. (Ex. 199).

Mr. Nath probably called Mr. Hoot on or just before April 19, 2004. Mr. Hoot requested a copy of the lining specification and an approximation of the quantity of materials required, the "take-offs." Mr. Nath faxed this information to Hoot on April 19. (Ex. 21). After looking at the specification Mr. Hoot spoke with Mr. Nath and told him if Hoot bid on the project it would have to be on an or-equal basis.[14]

Mr. Hoot faxed the specification to John Pico, an Ameron field service representative, and followed up with a call to Mr. Pico. They discussed whether Ameron's lining products would equal the specified Linabond product. Not surprisingly Mr. Pico assured Mr. Hoot Ameron's products

---

13. Arrow–Lock was considered for a small section of the existing concrete at Springfield, but the concrete was in poor condition and it was decided to use a coating supplied by an applicator who was already on site.

14. Mr. Hoot also testified at trial that he told Mr. Nath it looked like the specification was a sole source specification for the Linabond sys-

tem. In his deposition Mr. Hoot testified he did not discuss with Mr. Nath whether the lining specification was a sole source specification. This inconsistency prevents the Court from finding Mr. Hoot made the statement, but Mr. Hoot's trial testimony in this regard indicates he recognized from the outset that the specification appeared to have been drafted as a sole source specification.

were the equal of Linabond's. Mr. Hoot then called Mr. Nath. Mr. Hoot told Nath he had spoken with Ameron and there should be no problem using Ameron's products on the project, Hoot had never had Ameron rejected as an or-equal, and Ameron was considered equal to Linabond in the industry. Mr. Hoot informed Mr. Nath that Hoot would send a bid in on an or-equal basis. All of this occurred in short order for later on April 19 Hoot faxed Jones a quote for "T–Lock or Arrow–Lock liner at the referenced project." (Ex. 22).

For his part, Mr. Nath did not recall any conversations he may have had with Mr. Hoot prior to Hoot's bid. He testified Jones relied only on the quote it received from Hoot. Mr. Nath knew the quote was for Ameron products, not the specified Linabond system, and that an "or-equal" submission had to be approved by the project engineer.

Hoot's bid for installing a mix of Ameron's T–Lock and Arrow–Lock on the new and existing structures was $382,074.00. (Ex. 22 at 2). Mr. Nath did not have any other liner bids at the time Jones prepared what would be its first bid on the project.

On April 20, 2004, Jones submitted its initial bid for general construction work on the project. (Exs. 23, 25). Jones listed Hoot as its concrete lining contractor but provided no other information concerning Hoot's quote. (Ex. 23 at 9). Jones was the low bidder, substantially so. (Ex. 26). However, Jones found a mistake in its bid and requested and received permission from WRA to withdraw it. (Exs. 25, 27).

WRA rejected the initial round of bids and directed the project be let for rebidding. (Ex. 33). A new bid closing date of June 8, 2004 was set. (Ex. 48 at 144). Jones was allowed to rebid. On June 8, 2004, Jones received unsolicited bids from Graham Construction, Inc. and CDP Maintenance, Inc. for the liner portion of the project. (Exs. 40, 203, WRA 5). The Graham and CDP bids were based on the Linabond co-lining system (though this was not evident from Graham's bid) and were in the amounts of $614,881 and $1,087,988 respectively. Jones again used Hoot's quote in its second bid, although it neglected to include Hoot's identification or quote in the bid documents submitted to WRA. (Ex. 35 at 6). Jones was again the low bidder when the bids were opened on June 8, 2004 and again substantially so. (Ex. 38). Scott Hutchens of WRA contacted Jones about the missing information, to which Jones promptly responded, identifying Hoot as the co-lining subcontractor and $382,074 as the lining subcontract amount. (Ex. 39). On B&V's recommendation WRA awarded the general construction contract for the project to Jones for the low bid amount of $9,305,401. (Ex. 42).

Jones and WRA entered into the "WRA Public Improvement Contract" on July 1, 2004 (hereinafter "general contract"). (Ex. 48). The contract included the Urban Standards, (id. at 294), and the "Protective Co–Lining System" specification in section 09887. (Id. at 407).

In the meantime Hoot had heard nothing from Jones about the status of its bid or whether it had even been incorporated in Jones' bid. Around July 19, 2004 Sue Daul, the contract administrator at Jones, wrote to Hoot enclosing Jones' standard subcontract form with a request that it be signed and returned in ten days. (Ex. 50). This was followed on July 22, 2004 by a congratulatory fax from Jones saying submittals were due July 30, 2004. (Ex. 54). Both Theta McDurham, Hoot's project administrator, and Mr. Hoot reviewed the subcontract. At Mr. Hoot's direction, Ms. McDurham changed the subcontract by adding two new terms which she typed on the contract form just after the signature

lines: "Contract amount to be based on actual square footage of liner installed, welded and tested. Full set of construction drawings is required to perform work outlined in Section 09887." (Ex. 57 at 12). Hoot had based its bid on information from Mr. Nath about the quantity of liner involved. Hoot added the unit price and construction drawings terms to ensure it would be compensated for all of the liner it installed. Hoot did not return the subcontract right away. Mr. Hoot signed it with the additional terms on August 3, 2004 and on August 4 Ms. McDurham sent the subcontract on to Jones. (Exs. 55, 56, 57). In a fax cover sheet Ms. McDurham also said eight submittals would be sent to Jones that day by mail. (Ex. 56).

Hoot's company policy was to include its bid in any subcontract it entered into with a general contractor as a means of limiting the scope of its work to what it had bid. It did this by attaching its bid as an exhibit to the contract. Hoot had done this with Jones in connection with the 2003 Springfield, Missouri project. (Ex. HC 5 at 11–14). When Ms. McDurham sent the signed contract to Jones on August 4, 2004 she did not attach the bid for inclusion in the contract—referred to in the testimony as "Exhibit B." This omission was noted and on August 11, 2004 Ms. McDurham faxed Exhibit B to Jones' Mr. Nath with a cover sheet requesting that it be added to the subcontract, signed by Jones, and returned to Hoot. (Ex. HC 1 at 1). Hoot intended that as with the subcontract on the Springfield project, Exhibit B would describe the work Hoot was to perform. Exhibit B expressly provided that it was "[t]o be entered into and made a part of Section 16.4—Other Special Provisions" of the subcontract, which is what had been done with the subcontract documents on the Springfield project. (*Compare* Ex. HC 1 at 3 *with* Ex. HC 5 at 11–14). Ms. McDurham testified she followed up with a phone call to Mr. Nath the same day. Mr.

Nath had received the fax and, according to Ms. McDurham, said he or Jeff Jones would sign Exhibit B and return it to Hoot as requested. Mr. Nath and Ms. McDurham discussed that the project would be handled "just like Springfield."

Ms. McDurham prepared daily notes for Mr. Hoot. In her notes for August 11, 2004 she wrote: "Scott Nath/John T. Jones/Des Moines, IA . . . requested 'Exhibit' be added to subcontract as was done for Springfield, MO Subcontract. Done—faxed Exhibit (attached) Scott or Jeff T. Jones will approve, sign and return by fax." (Ex. BV 24 at 1). Mr. Nath has no recollection of any conversation he may have had with Ms. McDurham about Exhibit B. He testified he did not have authority to enter into contracts, or to modify a contract, without talking to Jeff or John Jones first. He also said his "OK" notes on Jones' copy of Ms. McDurham's faxed copy of Exhibit B had to do with the quantities of the material described in the exhibit. (*See* Exs. 222, 223). In view of Hoot's practice of including its bids in subcontracts, Ms. McDurham's testimony concerning her discussion with Mr. Nath about Exhibit B seems plausible. Her testimony is further supported by her contemporaneous notes of her conversation with Mr. Nath. For these reasons the Court credits her version of what passed between her and Mr. Nath on August 11 and finds that Mr. Nath told Ms. McDurham that Jones would approve the addition of Exhibit B to the contract and would return a signed copy to Hoot.

Hoot's unit price proposal caused some concern to Jones because it potentially made Hoot's compensation indefinite. Mr. Nath checked the anticipated square footage against the bid amounts and talked to Mr. Jeff Jones, who agreed there should be no problem agreeing to the unit price term Hoot had proposed. (*See* Exs. 222, 223).

Mr. Jeff Jones signed the subcontract for Jones on August 18, 2004. It was mailed to Hoot on Friday, August 20 and received by Hoot on August 23. (Ex. 58 at 1–2). The subcontract included the two new terms proposed by Hoot, but Exhibit B was not signed by Jones nor was it included in the subcontract documents returned to Hoot. Its absence was unexplained.

Ms. McDurham reviewed the executed subcontract as returned by Jones and noted the absence of Exhibit B. She brought it to Mr. Hoot's attention. Hoot did not pursue the matter. Neither Mr. Hoot nor Ms. McDurham had any further contact with any representative of Jones about Exhibit B until December 4, 2004 when Jones and Hoot were in dispute about Hoot's obligations under the subcontract.

On August 25, 2004 Jones received the submittals from Hoot. (Ex. 59 at 3). When they were actually sent by Hoot is not clear in the evidence. Mr. Hoot testified that because of the amount of work required to prepare submittals they were typically not sent out until Hoot had a contract in hand. Ms. McDurham does not recall when the submittals were mailed.[15] The parties have stipulated, however, that Hoot sent the submittals for the lining system to Jones after receiving the executed subcontract from Jones on August 23. (Order on Final Pretrial Conference at 4).

The same day Jones received the submittals from Hoot, it sent them on to B&V where they were processed as Submittal No. 32. (Ex. BV 59 at 2–3). Under its contract with WRA, B&V had been assigned the job of reviewing submittals and,

subject to WRA's approval, exercised the jurisdictional engineer's responsibilities in this regard under the general contract. (Ex. 48 at 345; Ex. 197 at 46).[16] The contract provided "requests for review of equivalency" would not be considered until after the general contract was awarded, (Ex. 48 at 227), and even after the contract was awarded both the Urban Standards and specific project requirements of the contract instructed no proposed or-equal product was to be ordered until after the engineer reviewed the submittal and approved the or-equal. (*Id.* at 217, 305). The engineer was the "sole judge of the acceptability" of submittals and whether an item of material or equipment qualified as an or-equal was in the "sole discretion" of the engineer. (*Id.* at 215). The general contract vested the jurisdictional engineer with authority to decide "any and all questions which may arise as to the quality or acceptability of materials furnished" concerning which the engineer's decision was "final." (*Id.* at 345).

Submittal No. 32 called for the installation of Ameron's T–Lock PVC sheet liner and Arrow–Lock sheet lining system, the former presumably on the new waste-to-digester wetwell (the only new structure to be protected) and the latter on the existing structures. The submittal was not expressly identified as seeking approval of an or-equal lining system and perhaps for this reason it did not get much in-depth consideration from B&V. It went to Mr. Botero who noted the differences between the specified materials and liner physical properties (which were, as noted, those of the Linabond co-lining system) and those of the Ameron products (*see* BV Ex. 35),

---

**15.** On August 23 Ms. McDurham spoke to Mr. Nath about Arrow–Lock's cure time. Her notes reflect that in the course of their discussion she told Mr. Nath he should be receiving the submittals "today or tomorrow." (Ex. BV 24 at 57).

**16.** The "jurisdictional engineer" or "engineer" was defined in the general contract as the "authorized representative" of the local jurisdiction. (Ex. 48 at 210, 306). WRA retained the ultimate authority as jurisdictional engineer.

spoke to Ms. Kliewer and decided the submittal was not acceptable. Ms. Kliewer testified that while the submittal did not purport to deviate from the specifications it seemed obvious to her when she read it that it did so.

On September 2, 2004 B&V rejected Submittal No. 32 because the proposed lining system "does not meet the specification requirements." (Ex. 60). The rejection flowed through Jones to Hoot. Mr. Hoot was taken by surprise. He had never before had an Ameron product rejected. Following the chain of command, he wrote to Jones' Mr. Nath on September 10, 2004 asking for an explanation. (Ex. 61 at 3). Jones sent the inquiry to B&V which reviewed it as "Request for Information No. 7" (the "RFI").

The RFI received more attention from B&V than the original submittal. Again Mr. Botero was primarily involved. He reviewed the shop drawings and the original submittal, and talked to Ms. Kliewer. Mr. Botero e-mailed a memorandum of his findings to Ms. Kliewer. (Ex. 62). He noted T–Lock was only a liner and not a co-lining system. He observed that Arrow–Lock, like Linabond, was attached to a mastic, but beyond that there were a number of differences: Arrow–Lock's seams were hot-air welded, Arrow–Lock did not use a surface activator, Linabond's product literature said that welded liners did not hold external hydrostatic pressure as well as bonded liners, the Arrow–Lock liner did not meet the specified tensile strength and durometer values, Arrow–Lock was a thicker liner, it was possible the Arrow–Lock arrow-shaped fasteners would penetrate the full thickness of the mastic, there were differences in the composition of the Arrow–Lock and Linabond mastics, and the Linabond liner was semi-rigid whereas the Arrow–Lock liner was flexible.

Mr. Botero also sent his e-mail to Mr. Kerns for review and comment. Mr. Kerns for the most part agreed with Mr. Botero. He responded to Mr. Botero and Ms. Kliewer that "[s]ince we used a spec that was based on the Lynabond [sic] system, I don't believe the Ameron T–Lock or Arrow–Lock systems should be considered equivalent." (Ex. 65 at 1).

On September 28, 2004 B&V responded to the RFI stating that T–Lock was unacceptable because it was a lining, not a "co-lining" system and therefore not comparable, and the Arrow–Lock system differed from the specifications in that its joints were fusion-welded with hot air rather than chemically bonded, Arrow–Lock did not use a surface activator, and it did not meet the tensile strength and durometer values. (Ex. 66 at 2). The other differences noted by Mr. Botero in his e-mail to Ms. Kliewer and Mr. Kerns were omitted because of uncertainty about their validity as a basis to reject Ameron.

A few weeks later, on October 20, 2004, Mr. Hoot called Robert Fisher, an Ameron Regional Sales Manager, and asked for his assistance in persuading B&V to accept Ameron products for the project. Mr. Fisher happened to be at B&V's Kansas City office at the time he got the call and he attempted to see Ms. Kliewer. Ms. Kliewer would not see him at the time.[17] On November 2, 2004 Mr. Fisher wrote to Ms. Kliewer about the "Arrow–Lock submittals." (Ex. 70 at 1).[18] He started by

---

17. Mr. Fisher says he was never able to talk to Ms. Kliewer about the Ameron rejection, however, in his subsequent November 2, 2004 letter to her he referenced a conversation he had with her about B&V's objections. (Ex. 70 at 1).

18. The installation of T–Lock as a part of the lining submittal was effectively abandoned by Jones and Hoot after the RFI response. Thereafter the push was for Arrow–Lock.

saying the Arrow–Lock lining system had been approved as an or-equal on numerous projects where Linabond had been specified, and vice versa. He pointed out that the project lining specification was written in terms proprietary to Linabond, making it a sole source specification. Then he addressed the reasons given in the response to the RFI. He argued that while Arrow–Lock did not use a surface activator, mechanically locking the liner sheets as Arrow–Lock did avoided the risk of delamination. He contended the differences in hardness and tensile strength between the two liners merely meant that the Arrow–Lock lining sheets were more pliable and capable of withstanding lower temperatures. He stressed Ameron's fifty years' of experience and sent along Ameron product literature, a trade publication article about a successful Ameron project in Topeka, Kansas, a list of Ameron installations, and the results of a Redner acid bath test. The letter was treated by B&V as Submittal No. 32A.

Ms. Kliewer and Mr. Botero reviewed the submittal. Ms. Kliewer asked Mr. Ardahl, the author of the "cut file" specification, to review Mr. Fisher's letter. Mr. Ardahl had by then retired from B&V but continued to serve it as an in-house consultant. Mr. Ardahl has substantial experience over a lengthy career in concrete, corrosion and corrosion-protection systems for concrete. (*See* BV Ex. 17). He reviewed and compared the Arrow–Lock system with the project lining system specifications. In doing so he reviewed the Arrow–Lock information submitted by Mr. Fisher. On November 15, 2004 Mr. Ardahl wrote a memorandum to Ms. Kliewer giving his opinions. He began by stating that a "co-lining" system had to provide corrosion protection "on two levels, the PVC sheet and the mastic with maximum adhesion of the liner to the mastic." (Ex. 73). He saw the Arrow–Lock system as providing only one level of protection. As the Court understands Mr. Ardahl's testimony, he believed this to be the case because no data had been provided to indicate the corrosion resistance of the Arrow–Lock mastic. In his memorandum Mr. Ardahl noted the Arrow–Lock system did not bond the PVC sheets to the mastic. If the liner was compromised the corrosive environment would attack the mastic between the arrow projections. (*Id.*) This would be exacerbated if there were voids around the arrow projections.

Mr. Ardahl wrote he was also concerned about Ameron's use of an epoxy mastic where thermal expansion and contraction could occur because epoxies and the concrete substrate would not react the same to thermal changes. (Ex. 73). He testified that when epoxies cure they give off a lot of heat which he did not like to see around concrete, and epoxies can be more rigid. Finally, Mr. Ardahl observed no information had been provided to evaluate the Arrow–Lock primer and mastic materials, noting the project specification "clearly indicates the requirements for these...." (*Id.*) For these reasons Mr. Ardahl concluded the Arrow–Lock system was not equal to the Linabond co-lining system.

Mr. Ardahl testified he would not have considered the Arrow–Lock system to be equal unless it had met or exceeded the entire specification, including the materials and physical property values.

On November 16, 2004 Ms. Kliewer e-mailed Mr. Ardahl's memorandum to Mr. Nath and Mr. Fisher stating Arrow–Lock was "not acceptable for the Des Moines project." (Ex. 75). A formal rejection of Submittal No. 32A was sent out by B&V the same day. (Ex. 77).

Jones sent Mr. Ardahl's memorandum to Steven Smyczek, an Ameron manufacturer's representative, though not an Ameron employee or engineer. Mr. Smyczek

wrote to Mr. Nath on November 16, 2004 responding to Mr. Ardahl's memorandum point by point. (Ex. 76). He argued that "co-lining" was a Linabond marketing term, that the Ameron Arrow–Lock system in fact did provide two levels of protection with its mastic and PVC liner—what he termed a similar "belt AND suspenders" approach—and that overall Ameron's mechanical attachment of the liner to the mastic was superior to Linabond's "glued on" process. (*Id.* at 2). In the course of his letter Mr. Smyczek stated that Ameron's mastic would "withstand up to 70% sulfuric acid." (*Id.* at 1). There was no basis for this claim.

Mr. Smyczek's letter was forwarded to B&V by Mr. Nath. Ms. Kliewer reviewed the letter. Months later she reviewed the letter again with Linabond's Mr. Bill Sato and Mr. Gilli and asked them questions generated by the letter as well as Mr. Fisher's letter of November 2, 2004. (*See* Exs. 118–121, 195 at 373–74).

Ms. Kliewer and Mr. Botero did not know at the time Submittal Nos. 32 and 32A were reviewed that Jones and Hoot had entered into a subcontract or that Jones had based its bid on the Ameron products. Ms. Kliewer testified she first learned of this in mid-December 2004 when Jones proposed a meeting with Hoot. (*See* Ex. 86).

B&V's rejection of the Ameron submittals presented Jones and Hoot with the issue of which of them would bear the ultimate responsibility of furnishing the more expensive Linabond lining system if that was what would be required. On December 1, 2004 Mr. Nath wrote to Mr. Hoot about an upcoming milestone date and the possibility that afterward contractual damages might be owing under the general contract if the lining system was not complete. Mr. Nath told Mr. Hoot that any liquidated damages assessed against Jones would be the responsibility of Hoot. Among the options suggested by Mr. Nath was that Hoot would get certified as a Linabond installer or hire a Linabond installer to perform the work. (Ex. 78). Hoot was not interested in either option. It has never been a certified Linabond installer.

On December 9, 2004 Mr. Nath spoke to Hoot's Ms. McDurham followed by a fax in which he said if Hoot did not reply to the December 1 letter, Jones would have to involve an attorney. (Ex. 80). Hoot, however, struck first with an attorney. On December 10, 2004 its attorney, Ms. Lynette Bratton, responded to Mr. Nath's December 1 letter. Referring to "Exhibit B to the Subcontract" Ms. Bratton wrote that Hoot had contracted to install the Ameron T–Lock and Arrow–Lock lining systems. The "wrongful" rejection of Submittal No. 32A prevented Hoot from performing its contract to install the Ameron products and Jones' failure to secure approval was a breach of the subcontract between Jones and Hoot excusing future performance. Ms. Bratton demanded that the submittal be approved by Jones or that Jones agree to termination of the subcontract. (Ex. 82 at 3–4). Mr. Nath forwarded the letter to B&V. On December 14, 2004 Mr. Nath responded to Ms. Bratton outlining Jones' position that it was Hoot's obligation to furnish a lining system in compliance with the lining specification and proposing that Hoot, an Ameron representative, and Jones meet with B&V engineers in an attempt to resolve the issue. (Ex. 84). Mr. Nath also said that Exhibit B, while proposed by Hoot as a part of the subcontract, had not been agreed to by Jones and was not a part of it.

On December 15, 2004 Mr. Nath wrote to B&V proposing the meeting he had suggested in his December 14 communication to Ms. Bratton, adding that if Jones was required to install the Linabond sys-

tem it would request a change order to cover the additional expense. (Ex. 86). Mr. Nath also said that if the Ameron products were approved, Jones would consider issuing an extended warranty for three to five years rather than the usual one year.

The December 15 letter prompted Ms. Kliewer to seek the advice of Robert Crist, a B&V Ph.D. civil and structural engineer with many years of experience who, among other things, served as a claims and risk manager for B&V. B&V engineers seek him out when they see a "red flag" on a project. Ms. Kliewer went to see Mr. Crist and brought with her some of the Arrow–Lock materials which had been furnished with the submittals together with drawings of the project. Mr. Crist looked these over. He advised Ms. Kliewer not to continue responding to requests to reconsider Arrow–Lock as an alternative as he viewed the insistence on Arrow–Lock as getting to the point of badgering. Mr. Crist also told Ms. Kliewer he did not think Arrow–Lock's mechanical anchoring system was favorable from a constructability point of view.

After talking with Mr. Crist, Ms. Kliewer sent a brief fax note to Mr. Nath on December 21, 2004 stating B&V did not see the need to meet on the liner issue. (Ex. 87). The same date she corresponded with WRA noting B&V's position that the proposed Ameron products did not meet the lining system specifications and for that reason had been rejected. Ms. Kliewer added that she saw no reason to discuss the matter further. (Ex. WRA 19). At about this time Mr. Nath appears to have approached WRA directly about the proposed meeting. WRA responded the Ameron product was not an or-equal product and it was unnecessary for the interested parties to meet to discuss the issue as Mr. Nath had proposed. (Ex. 88).

Also in December 2004 Ms. Kliewer asked another B&V project engineer, Earl Jenkins, if he thought Arrow–Lock was equivalent to Linabond. Mr. Jenkins had used Linabond on projects, but was not familiar with Arrow–Lock. Ms. Kliewer showed Mr. Jenkins an Arrow–Lock sample. Based on the sample and his experience with Linabond Mr. Jenkins told Ms. Kliewer he did not think the systems were equivalent because Arrow–Lock was not chemically bonded and he thought Arrow–Lock's fusion welds would be susceptible to breaking with expansion and contraction.

On January 7, 2005 Ms. Bratton wrote to Jones' attorney, Maurice McCormick, repeating the contention in her December 10, 2004 letter that B&V's rejection of the Ameron submittals prevented Hoot from performing its subcontract to install the Ameron lining systems resulting in a breach of the subcontract. (Ex. 112 at 3). On behalf of Hoot Ms. Bratton terminated the subcontract effective immediately. Mr. McCormick wrote back to Ms. Bratton on January 12, 2005 with Jones' position that if Ameron was not approved, Hoot's subcontract obligated it to install the Linabond lining system. (Ex. WRA 20 at 3–4). Jones rejected the attempted termination of the subcontract and informed Hoot that it would be held responsible for any amounts Jones was required to pay to complete the project.

Hoot and Jones approached B&V again. On February 22, 2005 Hoot sent a packet of materials to Jones which Jones in turn, on February 25, 2005, sent to B&V as a "re-submittal for the Co–Lining System." (Ex. 102). The re-submittal, which was solely for the Arrow–Lock system, was assigned Submittal No. 32B. It consisted of a cover letter from Hoot, the project lining specification, Mr. Ardahl's November 15, 2004 memorandum and Mr. Smyc-

zek's November 16, 2004 rebuttal, Mr. Fisher's November 2, 2004 letter to B&V and accompanying information to Ms. Kliewer, a 2001 laboratory test result of the physical and material properties of the T–Lock PVC sheeting, and the August 2002 Redner report. The Redner report was the principal item of new information in the submittal. (*Id.* at 69). In a conclusion Mr. Hoot wrote that there was no reason the Arrow–Lock system should not be considered the equal of the Linabond system. (*Id.* at 89). The submittal was reviewed by Ms. Kliewer to see what the products in the submittal were and whether they had been changed. In addition, Ms. Kliewer may have talked to Mr. Kerns about it. In an e-mail communication Mr. Kerns again told Ms. Kliewer he did not believe Arrow–Lock should be considered equivalent to the Linabond system. (Ex. 108). On March 15, 2005 Submittal No. 32B was returned to Jones by B&V marked "Returned Without Review." (Ex. 109 at 1, 3).

On March 24, 2005, Jones gave Hoot written notice it was in default with three days to cure. (Ex. 110). When this did not happen Jones followed on March 30, 2005 with a seven-day notice of contract termination stating that if Hoot did not correct the breach Jones would employ others to complete the subcontract work at Hoot's expense. (Ex. 111). Hoot, through its attorney Bratton, responded that it had earlier terminated the contract. (Ex. 112).

In the same approximate time frame Mr. John Jones wrote to Ms. Kliewer pointing out the problems and increased cost of performance to Jones occasioned by the rejection of Submittal No. 32B, asking again that B&V reconsider its rejection of Ameron in light of the probability of legal proceedings. (Ex. 113). Nothing came of the request and on May 3, 2005, Jones notified B&V it would submit a claim for

the additional cost of installing the Linabond system. (Ex. 114).

This appears to have caused Ms. Kliewer to contact Linabond's Mr. Sato and Mr. Gilli to review some of the issues Ameron had raised, presumably referring to the November 2004 letters written by Mr. Fisher and Mr. Smyczek. (*See* Ex. 195 at 372–73). She asked Sato and Gilli to answer questions about how Linabond's fully bonded system responded to moving or cracking of the concrete, sought data on the structural polymer mastic's ability to withstand corrosion, the range of temperatures Linabond's system would tolerate, and any additives in its PVC liner and potential effect on performance. (Exs. 118–20). She also asked Linabond for, received and apparently reviewed the Redner report at this time. (Ex. 121). On May 8, 2005 Ms. Kliewer wrote a memorandum to the project file summarizing the evaluations and reviews of the Ameron submittals, her contacts with other B&V engineers on the or-equal issue, and her communications with Mr. Sato and Mr. Gilli concerning questions raised by Ameron. (Ex. 195 at 372–75). The next day, May 9, 2004, Ms. Kliewer wrote to WRA recommending that any attempt by Jones to file a claim for the additional cost of installing the Linabond system be denied. (Ex. 122).

On May 18, 2005 B&V and WRA received Jones' claim in the amount of $232,807. (Ex. 128). WRA wrote to Jones on June 1, 2005 denying the claim. (Ex. 132).

There would be one final push for Ameron. On May 31, 2005 Mr. Redner wrote to Mr. John Jones about the project. (Ex. 133). He noted that the specifications for rehabilitating the concrete surfaces were "written around" Linabond's co-lining system. (*Id.* at 2). He wrote that based on his experience the PVC flexible liner in the

Linabond system was never fully bonded to the mastic because there were always "varying degrees of noncompromising disbondment" (air bubbles where the liner did not attach), a phenomenon he expected would also occur with the semi-rigid liner to be used in the Des Moines project. Mr. Redner opined that the mechanical anchoring of the PVC liner used in Ameron's T–Lock and Arrow–Lock systems was equal to Linabond's chemically-bonded means of fastening the liner to the mastic. (*Id.* at 3). He continued that he believed both the Ameron and Linabond systems would meet the specified conditions of service and concluded by saying Arrow–Lock was Linabond's equal. (*Id.*) On June 2, 2005 Mr. Nath faxed Mr. Redner's letter to Mr. Scott Hutchens, a Des Moines city engineer assigned to WRA and who served as WRA's project engineer, and to Ms. Kliewer.

On June 13, 2005 Mr. Hoot wrote to Mr. Nath offering an extended five-year warranty on Hoot's workmanship in installing Arrow–Lock. (Ex. 135).

In the meantime Mr. Jeff Jones renewed the proposal, rejected the previous December, for a meeting between Jones, Hoot, B&V, WRA and Ameron and Linabond representatives. He spoke by phone with WRA Director William Stowe on June 11, 2005. Mr. Jones told Mr. Stowe that in light of the return of the latest submittal without review he was concerned about "where the whole thing was leading" and proposed the meeting. Mr. Stowe responded he would try to set up such a meeting.

On June 15, 2005 Mr. Jeff Jones met with Mr. Stowe in the latter's office. Mr. Jones complained that Jones was in the middle with Hoot refusing to install anything but Ameron and B&V insistent upon Linabond. Mr. Jones pressed for a meeting, telling Mr. Stowe "this is all going to hell in a handbasket" if the interested parties did not meet to sort things out. According to Mr. Jones, Mr. Stowe responded that a meeting was a good idea. Apparently Mr. Stowe asked Mr. Jones to supply him with information about the differences in hardness and tensile strength between Linabond's PVC liner and the Arrow–Lock liner. On June 17, 2005 Mr. Smyczek wrote to Mr. Jones on these subjects, stating essentially that Linabond's greater hardness and tensile strength did not reflect better performance, but simply the fact that the type of PVC lining required for a chemical bond necessarily had greater hardness and tensile strength. (Ex. 140 at 2–3). Mr. Jones promptly sent Smyczek's letter to Mr. Stowe. (*Id.* at 1).

In a handwritten note to Mr. Stowe dated June 16, Mr. Jones said Ameron had suggested that Mr. Stowe talk with Los Angeles County Sanitation official Tommy Sung and Mr. Redner. (Ex. 213). Mr. Stowe passed the note on to Des Moines City sewer enterprises administrator Carl Elshire for follow-up. Mr. Elshire called Mr. Sung who told him he had experience with the Linabond system and less so Ameron's Arrow–Lock system, that they had had some problems with Linabond in the form of peeling failures, and had experienced difficulty with Linabond's people supporting their product. (Ex. WRA 28 at 3). Mr. Elshire received a similar report from a "field guy." (*Id.*) Mr. Elshire was unable to make contact with Mr. Redner. Mr. Elshire summarized the results of his inquiries in a June 21, 2005 e-mail to Mr. Stowe which Mr. Stowe forwarded to Ms. Kliewer the next day with the question: "Any change in our position on unequivalency?" (Ex. 142).

Ms. Kliewer in a series of e-mails on June 15, 2005 corresponded with several B&V engineers in California and Nevada about their experience with Linabond's co-lining system and any they might have had

with Ameron's Arrow–Lock. (Exs. 137, 138, 147). Ms. Kliewer began the exchange by saying she was evaluating the two systems and asking if the engineers had any experience with either. (Ex. 137 at 2). She did not learn much. Linabond had been used on one project successfully, but none of the other engineers were familiar with Arrow–Lock.

On June 23, 2005 Mr. Stowe called Mr. Jeff Jones. He told Mr. Jones Ms. Kliewer could not meet that week and Linabond was not interested in the meeting. He also told Mr. Jones that the Los Angeles engineers they had talked to reported there had been some problems with Linabond. According to Mr. Jones' notes, Mr. Stowe also said his technical people had spoken with Mr. Redner who was a "fan" of the Arrow–Lock system. (Ex. 143).[19] Mr. Stowe said he would contact Mr. Jones again the following Monday, June 27.

Mr. Stowe, Mr. Elshire and Mr. Hall had a conference call with Ms. Kliewer on June 27. (*See* Ex. WRA 30). The Court infers from the context that the purpose of the call was an opportunity for Ms. Kliewer to defend B&V's decision that Ameron's Arrow–Lock system was not equal to Linabond's co-lining system in response to the information Mr. Stowe had received from Mr. Jones and Los Angeles sanitation officials. Mr. Elshire and Mr. Hall testified Ms. Kliewer explained why B&V had concluded Ameron's products were not equal. Mr. Elshire testified Ms. Kliewer also responded to the information he had obtained from Los Angeles. Ms. Kliewer recommended as she had before that the proposed Ameron products be rejected as not equal to Linabond. Later that afternoon Ms. Kliewer e-mailed Mr. Stowe that she hoped she had provided "enough information on our design evaluation and sub-

mittal review" and forwarded her original July 12, 2002 memorandum recommending Linabond. (Ex. 6). WRA, relying on B&V, followed its recommendation and the book was closed on the Ameron products as or-equal as far as WRA and B&V were concerned. Apparently this was conveyed to Jones on June 27 or shortly thereafter for Jones, on June 29, 2005, faxed to WRA a letter request for arbitration of WRA's denial of its claim for additional compensation. (Ex. WRA 33). The request was denied by WRA on July 19, 2005. (Ex. 148).

The general contract's specific project requirements contained a substitution clause, the first sentence of which stated: "If in Engineer's sole discretion an item of material or equipment proposed by Contractor does not qualify as an 'or-equal' item, it will be considered a proposed substitute item." (Ex. 48 at 215). The standard for a substitute item was "essentially equivalent" to that specified, a less onerous burden than "or equal" as Ms. Kliewer testified. (*Id.*) The quoted first sentence of the provision can be taken as indicating review of a rejected or-equal as a substitute would be automatic, but when the provision is considered in its entirety it is evident the contract contemplated the contractor was to request consideration as a substitute. A contractor wishing to furnish a substitute item was required to "first make written application for the evaluation thereof" to the engineer, certifying adequate performance, similarity in substance to the specified system, and suitability. (*Id.* at 216). The application was to provide specific additional information. (*Id.*) B&V did not review the rejected Ameron submittals as substitutes. Jones did not ask B&V to do so, or provide the certification and other information re-

---

**19.** It is doubtful Mr. Stowe would have said WRA engineers had talked to Mr. Redner when no such conversation had occurred. If he mentioned Mr. Redner, it is likely Mr. Stowe was referring to Mr. Redner's May 31, 2005 letter.

quired for substitute consideration. As Mr. Nath testified when asked about the substitution provision, Jones' focus was on Ameron as an or-equal.

On June 30, 2005 Jones entered into a subcontract with Graham Construction, Inc. to install the specified Linabond system for the contract price of $614,881, the same bid Graham had sent to Jones a year earlier. On August 23, 2005 Jones sent the Graham Linabond submittal (Submittal No. 110) to B&V. (Ex. 150). B&V conditionally accepted the submittal on September 2, 2005. (*Id.*) Graham Construction merged with or was bought out by Abhe & Svoboda, Inc. which completed the liner installation. Jones has paid the subcontract amount to Abhe & Svoboda.

Jones commenced this lawsuit on September 20, 2005.

## C. Equivalency

Clearly Jones and Hoot have made a threshold showing that Ameron's Arrow–Lock lining system was equal to the specified Linabond co-lining system. Substantial evidence of this is to be found in Mr. Redner's testimony, the fact Arrow–Lock has been found equal to Linabond's system on other projects, and Ameron's long and successful history with mechanically-anchored lining systems. It is also evident from the testimony of the engineering pro-

fessionals on both sides and the senior representatives of Linabond and Ameron (respectively Mr. Gilli[20] and Mr. Pico) that reasonable engineers superintending a wastewater treatment project could prefer one lining system over the other. The two systems differ significantly with respect to the type of mastic and how the PVC liner is affixed to the mastic. While Mr. Redner likes Linabond's products, he prefers Arrow–Lock's mechanically-anchored system. Yet he also testified in his experience some wastewater treatment facility owners specify an Ameron system or equal, an Ameron system as a sole source, a Linabond system or equal, a Linabond system as a sole source, and some specifications will list three or four protective systems as optional choices. It is evident from the testimony of Mr. Gilli and Mr. Pico that each company believes its product offers the superior means of attaching the liner to the mastic, a point representatives from both companies undoubtedly make in their presentations to engineers.

As a practical matter, Linabond's PVC liner is never 100% bonded to the mastic for, like wallpaper, there are always a few air pockets or bubbles. Indeed Mr. Gilli testified Linabond's standards allow for up to 8 by 8 inch "air inclusion" areas without repair though with proper application there should not be many of these.[21]

---

**20.** Jones and Hoot objected to some of Mr. Gilli's testimony as opinion testimony of an expert nature when Mr. Gilli had not been designated as an expert and had not provided a report. Mr. Gilli testified by deposition and primarily as a fact witness. The Court has received the deposition (offered in its entirety by B&V) subject to the objections. As far as the Court can tell, Mr. Gilli was not a retained expert, he is not an employee of a party, hence no written report of expert opinions was required. Fed.R.Civ.P. 26(a)(2)(B). The objected-to testimony had to do with differences between the Linabond and Ameron systems and how each system performed if the liner was compromised. The deposition was

taken a month before trial. No surprise nor prejudice is shown. In the circumstances if the expert disclosure rule applied to him any failure to designate Mr. Gilli as an expert was harmless. Fed.R.Civ.P. 37(c)(1).

**21.** Mr. Redner testified the formerly good relationship between the Los Angeles sanitation districts and Linabond has recently been disrupted by a dispute over the size and number of air inclusions on a recent installation. Linabond has since refused to bid on Los Angeles sanitation projects. Mr. Redner, who is well-acquainted with Linabond's president, Mr. Richard Bertram, has tried to patch things up

While Mr. Redner has not observed widespread failures of Linabond's system, he has seen instances in which the chemical bond has deteriorated over time leading to delamination as well as failures at the seams. The Redner test results suggest the Linabond system is more difficult to apply, and application errors create more air bubbles and increase the risk of delamination. Linabond is also more expensive. Finally, there is the fact Ameron first introduced mechanically-attached PVC liners with its T–Lock in 1947 and since then has had a proven track record in quality lining systems. These factors could well weigh more heavily in the balance than any concern that Arrow–Lock's mastic might be more susceptible to chemical attack in the event the liner is compromised.

There is another side, though. While epoxy mastics similar to Arrow–Lock's have shown resistance to corrosion, it is the fact that Ameron's mastic has not been tested and B&V had been presented with no data concerning its resistance to corrosion. Linabond's structural polymer mastic has been tested and passed the pickle jar test.

Ameron anticipates the possibility wastewater will get in between Arrow–Lock's liner and mastic, and that is factored into Arrow–Lock's design. Mr. Pico

testified the unbonded space between the arrow projections is intended to act as a "weak channel" to avoid the risk that hydrostatic back pressure would separate the liner from the mastic. (Pico Depo., Ex. 219 at 19, 30). The Arrow–Lock Power-Point (Ex. HC 13) promotes the absence of an adhesive bond as an advantage because it allows groundwater seepage to drain away.[22]

The presence of wastewater material between the liner and mastic is not a problem as long as the system remains anaerobic. If, as is likely to occur from time to time, the liner is punctured or torn introducing oxygen, the mastic can be exposed to hydrogen sulfide gas and sulfuric acid. The concern expressed by Mr. Ardahl was that with Arrow–Lock the mastic area between the arrow projections would be exposed to chemical attack. With Linabond's chemical bond only the immediate area should be affected because there is no pathway for the corrosive substances to travel.

Mastics are coatings and as such both the Arrow–Lock and Linabond mastics have a degree of porosity which means that if exposed to hydrogen sulfide gas and sulfuric acid, they will eventually fail. They do, however, provide backup protection for a period of time and that protec-

and convince Linabond to resume bidding on Los Angeles projects.

22. To Ms. Kliewer that Arrow–Lock's channels between the arrow projections could act as a kind of drain posed an additional problem. Concrete tanks and structures are most at risk from attack by hydrogen sulfide and sulfuric acid above the surface of the liquid in the tank or structure. Often just the ceilings and walls above the expected liquid level are protected. The WRA special waste tanks were intended to receive hauled waste. Deliveries were expected during the week with not much on the weekends. As a result the liquid level was expected to fluctuate widely

from almost empty to nearly full. To provide maximum protection the specification called for the tanks to be lined all the way around from floor to ceiling. Ms. Kliewer was concerned that with the Arrow–Lock system if wastewater got behind the lining and moved or migrated by hydrostatic pressure as the liquid level rose and fell, or due to gravity, there would be no place for the liquid to escape. With Linabond's continuous chemically-bonded lining there should be no liquid between the liner and the mastic. According to Linabond its structural polymer mastic enables its system to withstand greater hydrostatic pressure. (*See* Gilli Depo., Ex. 217 at 6).

tion was an important part of the design of the lining system desired by WRA.

A reasonable engineer might prefer a mastic whose resistance to corrosion has been tested over one that has not been tested. A reasonable engineer might also conclude a liner which, despite a few air bubbles, is continuously chemically bonded to the mastic would, if compromised, minimize exposure of the underlying mastic to the corrosive environment more so than a liner mechanically bonded only at the projections where it is pressed into the mastic.

The relative advantages and disadvantages of the Ameron mechanically-bonded system and Linabond's continuously chemically-bonded system are debatable, but reasonable professional engineers could differ on whether Ameron's Arrow–Lock system is the equal of the Linabond co-lining system in a given application, and vice versa.

### D. B&V's Good Faith

At the least, B&V had a duty to consider the Ameron submittals in good faith in the exercise of honest judgment. Jones and Hoot, particularly Jones, view this case as one in which B&V, with Linabond's connivance, drafted a "disguised" sole-source specification, one that appeared to allow for an equivalent system but in reality was all along intended by B&V and WRA to remain the sole-source specification originally drafted. As evidence of a preferential inside relationship between B&V and Linabond Jones points to the facts that in 1995 Linabond pitched its co-lining system to Mr. Ardahl, later that year Mr. Ardahl referred the City of Topeka, Kansas, to Linabond in connection with a wastewater project (Exs. 1, 2), Mr. Ardahl drafted the Linabond sole-source cut file specification for that project, and Linabond representatives were in contact with B&V in the fall of 2004 when they had no reason to expect Jones was going to install Linabond's system.

The Court is not convinced B&V and Linabond had any relationship other than the normal relationship between a manufacturer of construction products and an engineer with a potential use for those products. The record indicates it is common for manufacturers and vendors to pitch their products to design engineers. Ameron does it. In fact, when Mr. Hoot called Ameron's Mr. Fisher to obtain his assistance he caught Mr. Fisher just after he had made a presentation to a B&V engineer about Arrow–Lock. (Fisher Depo., Ex. 216 at 3, 15). Information from manufacturers and vendors is essential to engineers in making decisions about what products and materials to specify on a project. Mr. Ardahl's contacts with Linabond in 1995 and role as draftsman of the Linabond cut file specification are not remarkable. Mr. Ardahl testified that while he had not previously known about Arrow–Lock, he had much more experience with Ameron's' T–Lock system than with Linabond's products. That Linabond was in contact with B&V while the selection of a lining system was stalled over the or-equal issue merely reflects that Linabond, as much as Ameron, wanted the job.

By the time Submittal No. 32 arrived B&V had established a relationship with Linabond on the project. When Ms. Herron contacted Linabond's Ms. Pingel, Pingel (as other Linabond representatives would do later) responded immediately with information about Linabond's products. A Linabond representative visited the site and Linabond engineers worked with Mr. Botero in developing a specification and making technical recommendations. B&V had the Linabond cut file specification as a starting point. Having recommended the Linabond system to WRA, become familiar with the system

during the design process, and established a working relationship with Linabond, it is understandable B&V was favorably disposed to Linabond's co-lining system. These practical circumstances do not evince bad faith. They are likely to be present in the common situation in which a design engineer specifies a specialty product as the standard for type, function and quality desired.

Ms. Kliewer made the decision, approved by WRA, rejecting Arrow–Lock as an or-equal, so her conduct is telling on the issue of good faith. She was unfamiliar with the Arrow–Lock system and had no particular expertise with lining systems. Ms. Kliewer was evidently concerned enough about the information Mr. Fisher gave her in his November 2, 2004 letter to treat the letter and accompanying materials as a submittal and refer it to a more senior engineer with experience in the area, Mr. Ardahl. She did not have to do so. Submittals were to come from the general contractor, not a manufacturer's sales manager. (Ex. 48 at 227). She accepted Mr. Ardahl's opinion, stood by it in the end and later rejected Submittal No. 32B without review, but it is evident that even after the rejection of Submittal No. 32A Ms. Kliewer had second thoughts. As Jones and Hoot continued to press the issue she sought advice from other senior B&V engineers, Mr. Crist, Mr. Jenkins, and Mr. Kerns, all of whom supported her decision. She sought answers to questions raised in the letters of Mr. Fisher and Mr. Smyczek from Linabond's Mr. Sato and Mr. Gilli. She sought information from B&V engineers in California and Nevada about their experience with Linabond and any they might have had with Arrow–Lock. She penned a memorandum summarizing her evaluation. (Ex. 195 at 372–75). She had to defend her decision to WRA's representatives. These are not the actions of a person bent on enforcing a sole-source specification so much as they are the actions of a person seeking assurance that the correct decision had been made on a matter on which she lacked expertise and which was important to her client.

The Court concludes B&V's denial of the Ameron submittals was not tainted with collusion, secret intent or improper motive. B&V's assessment of Arrow–Lock as an or-equal was wanting in some respects as discussed later, but having considered Arrow–Lock B&V honestly believed the Linabond co-lining system would best serve the interests of its client, WRA. Right or wrong, at the end of the process B&V thought Linabond's chemically-bonded system offered greater protection for the rehabilitated tanks than Arrow–Lock.

Additional facts and ultimate findings are set forth in the discussion which follows.

## II.

## DISCUSSION WITH ADDITIONAL FINDINGS

In approaching the many claims between the parties it is appropriate to first discuss those brought against B&V by Jones and Hoot. From their standpoint B&V is the primary bad actor and resolution of the claims against B&V has much to do with the determination of the others. Except for Jones' contract claim against Hoot Iowa law governs.

A. *The Claims of Jones and Hoot Against B&V*

1. Professional Negligence

Jones and Hoot contend B&V was negligent. They do not articulate the specifications of negligence in the same way, but it appears to the Court both allege B&V was negligent in drafting the lining specification (including the underlying research), in reviewing Jones' lining submittals, and in

thereafter refusing to reconsider Ameron's Arrow–Lock as an or-equal or to meet to discuss the subject. Jones and Hoot also contend B&V had a duty to automatically consider Arrow–Lock as a substitute upon its rejection as an or-equal.

■■■■■ In Iowa "[a] design engineer may be held liable for failing to exercise the ordinary skill of the profession in drafting plans and specifications or in supervising construction work." *Shepherd Components, Inc. v. Brice Petrides–Donohue & Assoc., Inc.,* 473 N.W.2d 612, 615 (Iowa 1991)(citing *Evans v. Howard R. Green Co.,* 231 N.W.2d 907, 913 (Iowa 1975)). The extent of that duty is not limited by privity of contract. The duty extends to those who would foreseeably rely on the engineer's services, or be harmed by their negligent performance. *See Waldor Pump & Equip. Co. v. Orr–Schelen–Mayeron & Assoc., Inc.,* 386 N.W.2d 375, 377 (Minn.App.1986). The economic loss rule does not apply to claims of professional negligence. *See Kemin Indus. Inc. v. KPMG Peat Marwick L.L.P.,* 578 N.W.2d 212, 221 (Iowa 1998).

■■■■ B&V reviewed and determined the acceptability of submittals and materials for the project, subject to the approval of the jurisdictional engineer, WRA. The engineer was the sole judge of acceptability with the sole discretion to determine whether an item of material or equipment qualified as an "or equal." The engineer's decision was to be final. Generally, the decision of an engineer with broad discretionary authority of this nature is conclusive in the absence of "fraud, bad faith, or

a failure to exercise honest judgment." *U.S. Fidelity & Guaranty Co. v. Stanley Contracting, Inc.,* 396 F.Supp.2d 1157, 1171 (D.Or.2005)(applying Oregon law). "[U]nder Iowa law, when the parties (owner and contractor) to a construction contract agree to abide by discretionary decisions of the project engineer, the terms of the contract will be given full force and effect and the parties will be bound by the decision of the engineer." *Peter Kiewit Sons' Co. v. Iowa Southern Utilities Co.,* 355 F.Supp. 376, 393–94 (S.D.Iowa 1973)(citing *Nishnabotna Drainage Dist. v. Lana Const. Co.,* 185 Iowa 368, 373–74, 170 N.W. 491, 492 (1919)); *see Westech Engineering, Inc. v. Clearwater Constructors, Inc.,* 835 S.W.2d 190, 202–03 (Tex. App.1992). However, the engineer's "discretionary power is subject to the implied limitations of reasonableness and the duty to exercise care commensurate with the standards of his profession." *Peter Kiewit,* 355 F.Supp. at 394.

■■■ There is no allegation that B&V acted fraudulently and, as the Court has found, Jones and Hoot have not established that B&V acted in bad faith or was dishonest. The Court has also found reasonable engineers could differ with respect to which system was best suited to the WRA project. The issue then with respect to the assessment of Arrow–Lock as an or-equal is a straightforward one of whether B&V failed to exercise care commensurate with the standards of the engineering profession.[23]

■■■ The first step in the analysis is to determine what those standards are. Or-

---

**23.** In the August 8 ruling the Court posed but did not resolve a legal issue: "If B&V honestly and in good faith believed the Ameron lining system was not equal to Linabond's co-lining system, may Jones nonetheless recover if B&V failed to consider the Ameron submittals in accordance with engineering standards?" Ruling at 38. Having considered the matter further in light of the authorities discussed above, the Court agrees with Jones and Hoot that honesty and good faith do not insulate B&V from a failure to act in accordance with the standards of the engineering profession in assessing Arrow–Lock as a proposed or-equal.

dinarily, unless lack of care is obvious, expert testimony is required to establish the standard of care in a professional negligence action. *See Graeve v. Cherny,* 580 N.W.2d 800, 801 (Iowa 1998); *City of Urbandale v. Frevert–Ramsey–Kobes, Architects–Engineers, Inc.,* 435 N.W.2d 400, 402 (Iowa App.1988). Jones' expert, Mr. Redner, testified that B&V did not exercise due diligence. Hoot's expert, Dale Moore,[24] criticized B&V's work as inconsistent with the openness, competitiveness and fairness principles of what he described as the "Iowa public bidding model and procedures." He did not testify in any detail as to the source or content of the model and procedures. In its post-trial brief Hoot refers to Iowa Code § 542B.21(3), Iowa Administrative Code § 193C–8.2(3)[25] which is part of the Code of Professional Conduct established by the Iowa Engineering and Land Surveying Board, and Canons 3(a) and (b) of the American Society of Civil Engineers Code of Ethics (ASCE Ethics Code) as sources for the standard of care. (Hoot Post–Trial Brief at 16; *see* Ex. 187 (ASCE Ethics Code)). The statute does not set the applicable standard as it subjects an engineer to professional discipline for "knowingly making misleading, deceptive, untrue or fraudulent representations" and ethical conduct "harmful to the public" as a professional engineer. B&V did not knowingly make false or untrue representations, or engage in conduct harmful to the public. The administrative and ethical codes, on the other hand, in nearly identical language require engineers to be "objective and truthful" and to include all "relevant and pertinent information" in their reports, statements and testimony. I.A.C.

§ 193C–8.2(3); ASCE Ethics Code Canon 3(b). ASCE Canon 3(a) proscribes the dissemination of "untrue, unfair or exaggerated statements regarding engineering." A violation of professional ethical standards is some evidence of negligence. *See Ruden v. Jenk,* 543 N.W.2d 605, 611 (Iowa 1996); *Menzel v. Morse,* 362 N.W.2d 465, 473 (Iowa 1985).

From the limited authority available the Court concludes the standard of care required B&V to make an objective assessment of the proposed Arrow–Lock alternative in two particulars. The first of these was to determine whether Arrow–Lock's lining would perform adequately under the specified conditions of service.[26] Second, B&V was required to objectively assess whether the Arrow–Lock system was equivalent to the specified Linabond co-lining system in type, function and quality. This comes from the specific project requirements of the general contract which stated that any reference in a specification to a proprietary product or manufacturer was to be taken as "establishing the type, function, and quality desired." (Ex. 48 at 227). The duty to make an objective assessment did not require B&V to put aside the information it had relied on in adopting Linabond's co-lining system as the standard for type, function and quality. If B&V conducted an objective assessment, and its decision was within reason, its decision as approved by WRA was conclusive.

A number of the allegations of negligence have to do with B&V's use of a proprietary specification, research, and reliance on Linabond in drafting the specification. The Court has difficulty with the underlying assumption that a design engi-

---

**24.** Mr. Moore is a civil and structural engineer employed as vice president of project delivery for Shive–Hattery, a well-known engineering and architectural firm. Mr. Moore offices in Cedar Rapids, Iowa.

**25.** The cite in Hoot's brief should be to subsection 8.2(3) rather than 8.2(2). (*See* Hoot Post–Trial Brief at 16).

**26.** The specified conditions of service pertained only to the lining. (*See* Ex. 18 at 2).

neer owes a general duty to the universe of prospective contractors and subcontractors to adopt a particular type of specification, comprehensively research all available products, or rely or not rely on a particular source of information when drafting contract documents offered for bid. That said, for the purposes of the discussion which follows the Court has assumed B&V's duty of care extended to Jones and Hoot in these particulars.

Both Mr. Redner and Mr. Moore are critical of B&V's reliance on a proprietary rather than performance-based specification. If a proprietary specification was to be used, they say B&V could have listed several lining systems as acceptable. Doing so would have made the lining specification more competitive. The Court is not convinced that use of a proprietary specification based on Linabond's co-lining system or failure to specify alternatives amounted to a failure to exercise the care required of a professional engineer. The lining system was a specialty product and, as Mr. Moore testified, with specialty products a proprietary specification may be warranted. Both Ameron and Linabond have been specified as sole sources on other wastewater projects. In his report, Mr. Redner observed that the engineering profession has not developed "a standard set of properties that a protective lining or coating must satisfy to protect concrete surfaces from corrosion and wastewater applications," noting it is easier for an engineer to specify the properties of one product than it is to attempt to prepare a generic specification. (Ex. 195 at 7). B&V cannot be faulted for doing so in this case.

The research on which B&V based its Linabond co-lining system recommendation was clearly deficient. Mr. Ory suggested Ameron to Ms. Herron as a possible source but she did not follow up. It is speculative, however, whether contact with Ameron about its T–Lock or Arrow–Lock systems would have altered B&V's recommendation. As Ms. Kliewer's July 12, 2002 lining memorandum illustrates, B&V was from the beginning drawn to a chemically-bonded system in preference to a mechanically-anchored system. (Ex. 6 at 3).

Jones and Hoot argue B&V relied too much on Linabond's representatives in developing the lining specification. As discussed previously, it is common for design engineers in preparing specifications to seek information from manufacturers about their products. It seems reasonable this would be the case with a specialty product intended to address a particular concern of the owner. Ameron also assists engineers in preparing specifications and has a typical specification on its website. (Fisher Depo., Ex. 216 at 5). Linabond's co-lining system, no less than Ameron's, was well-suited to provide the sought-after protection for the rehabilitated tanks. B&V was not negligent in relying on information from the manufacturer of a proven product in developing the specification.

Mr. Moore viewed the lining specification as unfair when taken together with the general contract provision which prohibited equivalency evaluations until after the general contract was awarded. A contractor who bid solely on an or-equal basis took the risk that the alternative lining system would not be accepted, a fact which pushed prudent prospective bidders toward the safer course of the specified Linabond system. The only way Jones could have controlled the risk was by increasing its bid against the contingency the Ameron or-equal submittal would be rejected, though this would have increased the risk at the other end that Jones would not be the low bidder.[27]

---

27. As it turned out Jones had nothing to fear. Its bid was about $900,000 lower than the

The problem with the fairness argument is that while the negligent performance of a contract may give rise to an action in tort, the tail wags the dog if the tort claim is that the contract should have been different than what the parties agreed to. Jones did not have to submit a bid. It knew what the rules were. It is an experienced contractor, specializing in wastewater projects. The risk of basing its bid on an equivalent lining system should have been as apparent to Jones as it was to Mr. Moore.

Even if the contract had allowed pre-bid determinations of equivalency, the Court doubts Jones would have availed itself of the opportunity. It did not attend the pre-bid conference, made no inquiries about the lining specification, and did not request an interpretation of the specification as it had a right to do as a prospective bidder (*see* Ex. 48 at 319). In the interim between the abortive first bid cycle and the second when it would have had time to reflect and inquire Jones did nothing except to repackage Hoot's bid.

The focal point of the professional negligence claims is on B&V's consideration of Submittal No. 32A reviewed by Mr. Ardahl. The consideration of that submittal was ultimately the foundation for B&V's rejection of Arrow–Lock as an or-equal to the Linabond co-lining system. Here B&V did owe a duty of care to Jones and Hoot as discussed previously. Preliminarily, there is no question that Arrow–Lock's PVC liner would have performed adequately under the specified conditions of service. The issue is the objectivity of B&V's assessment of Arrow–Lock as an equivalent in terms of type, function and quality.

Mr. Ardahl, no less than the other B&V engineers, can justly be criticized for repeatedly referring to a "co-lining" system as an engineering term when it was merely a Linabond trademark, something he should have known from the information available to him. But from Ms. Kliewer's original July 12, 2002 lining memorandum through Mr. Ardahl's evaluation of Submittal No. 32A it is apparent that what B&V had in mind when it referred to a co-lining system was a liner over a coating (*i.e.,* mastic) affording two layers of protection. When Mr. Ardahl evaluated the Arrow–Lock system, he focused on what protection the system would afford in the foreseeable event the PVC liner was compromised. Mr. Ardahl thought a chemically-bonded liner if compromised would expose less of the mastic to chemical attack than the Arrow–Lock's mechanically-bonded liner and he had no data on the resistance of Arrow–Lock's mastic to corrosion. While debatable, these are objective judgments within the range of reason based on an assessment of function (the extent of exposure of the mastic if the liner is compromised) and quality (the resistance of the mastic to corrosion).

In his memorandum Mr. Ardahl also said the absence of information about Arrow–Lock's primer and mastic prevented him from determining whether these materials met the project specification. (Ex. 73). In his testimony Mr. Ardahl explained that to be equal Arrow–Lock had to meet or exceed the entire specification including the materials and liner physical property values. He may have had in mind the Urban Standards provision in the general contract which said the mention of a designated manufacturer was "not intended to exclude other processes, equipment or materials *that will meet or exceed the designated standards of that mentioned.*" (Ex. 48 at 305)(emphasis added). For two reasons the Court does not believe it is reasonable to interpret the term

next lowest. (Ex. 38).

"meet or exceed the designated standards" as requiring that a proposed or-equal incorporate the same proprietary material and physical values of a specified product. First, the materials and liner physical properties in the specification were optional with the lining material manufacturer, to be "used if approved" by the manufacturer. (Ex. 18 at 3). Second, and more fundamentally, the materials and liner physical properties in the specification simply describe Linabond's proprietary co-lining system. Rejecting Arrow–Lock because it did not duplicate Linabond's specifications is not the product of an objective assessment of Arrow–Lock in terms of type, function, and quality. It would represent an unreasonable rejection of Arrow–Lock simply because it is not Linabond.

Mr. Ardahl rejected Arrow–Lock as an or-equal for legitimate objective reasons and would also have rejected it for an impermissible, non-objective reason. Ms. Kliewer, at least through the rejection of Submittal No. 32A, operated under the same combination of objective and non-objective reasons. It is evident from Mr. Botero's RFI response that Submittal No. 32 was rejected only because Arrow–Lock did not duplicate Linabond's proprietary properties. However, Mr. Ardahl's rejection of Submittal No. 32A turned on the objective reasons. As efforts to gain approval of Arrow–Lock progressed it is evident that in the end B&V rejected Arrow–Lock because B&V believed Linabond's chemically-bonded system afforded greater protection, a particular point of emphasis for WRA. Consequently the Court cannot conclude that but for the partial misapplication of the equivalency standard in measuring Arrow–Lock against Linabond's proprietary properties Arrow–Lock would have been approved as equal. Put another way, even had the equivalency standard not been misapplied, the same result would have obtained. *See Berte v. Bode*, 692 N.W.2d 368, 372 (Iowa 2005)(discussing the "but for" cause in fact standard); *Housing 21, L.L.C. v. Atlantic Home Builders Co.*, 289 F.3d 1050, 1056 (8th Cir.2002)(applying Iowa law).

Lastly, Jones and Hoot maintain that B&V breached its duty of care when it rejected Submittal No. 32B without substantive consideration and refused to meet with Jones, Hoot and Ameron representatives, to discuss the equivalency issue.

Submittal No. 32B was expressly a "resubmittal." The Court does not believe the duty of care requires an engineer to revisit arguments and information considered and rejected in connection with a previous submittal. With one exception there was not much new in Submittal No. 32B. The exception was the Redner report with its indication that both Arrow–Lock's liner and Linabond's lining system had passed the test. Ms. Kliewer should have considered the Redner test results prior to rejecting Submittal No. 32B but any failure here was not a cause of damage to Jones or Hoot. She did so later, and the Redner test results did not directly address the concerns raised by Mr. Ardahl which led to the rejection of Submittal No. 32A.

Similarly, Ms. Kliewer's refusal to meet with Jones, Hoot and Ameron as proposed by Jones would not support a finding of breach of the duty of care unless there is reason to believe such a meeting would have presented B&V with new information having a material bearing on the equivalency issue. By the time these meetings were proposed B&V had received a great deal of information about Arrow–Lock from Jones (and Hoot through Jones), Mr. Fisher, and Mr. Smyczek, and later from Mr. Redner and as a result of the contacts with the Los Angeles sanitation officials in June 2005. The record does not indicate what new information, if any, would have

been presented to B&V in these meetings. Ms. Kliewer did meet with Jones' representatives monthly while the project was on-going. Jones could have raised the Ameron equivalency issue in these meetings but did not do so except to indicate they were getting more information from the subcontractor.

For the foregoing reasons, the Court finds Jones and Hoot have not established B&V breached a duty of care owing to them in connection with B&V's consideration of Ameron's Arrow–Lock lining system as an or-equal to the specified Linabond system which was a cause of any damage to Jones or Hoot.

2. Intentional Interference with Contract

Jones and Hoot contend that in rejecting Ameron as an or-equal to Linabond's lining system B&V intentionally interfered, in the case of Jones, with Jones' general contract with WRA by making Jones' performance more expensive, and, in the case of Hoot, with Hoot's subcontract with Jones by causing Jones not to perform the subcontract.

■ In Iowa the tort of intentional interference with contract requires proof:
" '(1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted.' "

*Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 399 (Iowa 2001)(quoting *Jones v. Lake Park Care Ctr., Inc.*, 569 N.W.2d 369, 377 (Iowa 1997), quoting in turn *Nesler v. Fisher & Co.*, 452 N.W.2d 191, 198 (Iowa 1990)); *see Green v. Racing Ass'n of Central Iowa*, 713 N.W.2d 234, 243 (Iowa

2006); *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 763 (Iowa 1999).

Preliminarily, though B&V did not know of the subcontract at the time it rejected Submittal Nos. 32 and 32A, the Court will assume for the purposes of Hoot's claim that B&V through reasonable inquiry would have learned of the subcontract. *Revere Transducers, Inc.*, 595 N.W.2d at 751. The weak point for both Jones and Hoot is the third element.

The requirement that the interference be improper comes from an attempt by the drafters of the Restatement (Second) of Torts "to combine the concepts of culpability and lack of justification." *Toney v. Casey's General Stores, Inc.*, 460 N.W.2d 849, 852 (Iowa 1990). The Iowa Supreme Court has instructed that the factors relevant to determining whether an interference is improper include:

1. The nature of the conduct.

2. The Defendant's motive.

3. The interests of the party with which the conduct interferes.

4. The interest sought to be advanced by the Defendant.

5. The social interests in protecting the freedom of action of the Defendant and the contractual interests of the other party.

6. The nearness or remoteness of the Defendant's conduct to the interference.

7. The relations between the parties.

*Green*, 713 N.W.2d at 244 (quoting *Revere Transducers*, 595 N.W.2d at 767). These factors are taken directly from Restatement (Second) of Torts § 767. The Iowa Supreme Court has also quoted with approval the Restatement's explanation:

... In determining whether the interference is improper, it may become very important to ascertain whether the actor

was motivated, in whole or in part, by a desire to interfere with the other's contractual relations. If this was the sole motive the interference is almost certain to be held improper.

... [I]f there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional, but the factor of motive carries little weight toward producing a determination that the interference was improper.

*Berger v. Cas' Feed Store, Inc.,* 543 N.W.2d 597, 599 (Iowa 1996)(quoting Restatement (Second) of Torts § 767 cmt. d); *see Green,* 713 N.W.2d at 244 (same). Put more simply by the *Green* court, "conduct is generally not improper if it was merely a consequence of actions taken for a purpose other than to interfere with a contract." 713 N.W.2d at 244.

■ B&V's rejection of the Arrow–Lock lining system as equal to the Linabond co-lining system was not motivated by any desire to interfere with the contractual relationships of Jones and Hoot under the general contract and subcontract. B&V was discharging the responsibility assigned to it by its contract with WRA to review and approve submittals. It was motivated solely by its belief that the Linabond co-lining system was best suited to achieve WRA's goal of protecting the rehabilitated concrete structures from corrosion.

The other Restatement factors do not support a finding of improper interference. The interests of Jones and Hoot are pecuniary arising from a risk both accepted when they committed to an or-equal product prior to approval by B&V; the interest sought to be advanced by B&V is that of its client WRA in adequately protected special waste tanks; there is a social interest in protecting the discretion of WRA and its agent, B&V, to decide what products are best suited to achieve the purposes of a public works project; nearness or remoteness of B&V's conduct to the interference is not a compelling factor here; the relationships between the parties are arms-length and contractually based.

Jones and Hoot have not established their claims of intentional interference with contract.

### 3. Negligent Misrepresentation

Jones claims B&V negligently supplied false information for its guidance which it justifiably relied on to its damage. The alleged false information was that a lining system equal to the specified Linabond co-lining system would be approved.

One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Sturm v. Peoples Trust & Savings Bank,* 713 N.W.2d 1, 5 (Iowa 2006)(quoting Restatement (Second) of Torts § 552); *see Sain v. Cedar Rapids Comm. Sch. Dist.,* 626 N.W.2d 115, 123–24 (Iowa 2001); *Freeman v. Ernst & Young,* 516 N.W.2d 835, 837 (Iowa 1994). Jones' claim falters on the elements of falsity, reliance and negligence.

As noted previously, Jones' theory of the case has been that all along B&V with WRA had a secret scheme or plan to sole-source the Linabond lining system which was disguised in a sop to competitive bidding principles by adding the "or equal"

language to the specification. The Court has found this was not the case.

■ The falsity issue depends in part on what an "or equal" clause like that in the general contract means. Mr. Redner testified such a clause implies an anticipation that there are other products on the market which would satisfy the specification. The Court cannot agree. The "or equal" clause merely carried with it an implied representation that the jurisdictional engineer would in good faith consider an "or equal" submittal. *See generally J.L. Malone & Assoc., Inc. v. United States,* 879 F.2d 841, 845 (Fed.Cir.1989).

At the time B&V added the "or equal" language at WRA's request B&V did not know whether there was another lining system which might be equal.[28] The duty of care did not impose upon B&V an obligation to ascertain whether there were equivalent lining systems prior to including the "or equal" language in the lining specification. Indeed, that the contract documents expressly excluded pre-bid equivalency determinations was a clear indication no such assessment had been made. Jones did not rely on the clause as signifying there were other equivalent products. All it knew about an equivalent product came from Hoot. It should have been clear to Jones from the contract documents that all it could depend on was good faith consideration of a proposed equal, that the ultimate decision was vested in sole discretion of the engineer, and if it submitted a bid on the basis of a proposed equal lining system it was taking a

risk that that system would not be approved.

It is true that when B&V rejected Arrow–Lock, the lining specification became a *de facto* sole source because at that point there was no equivalent. This resulted only through the process of considering Arrow–Lock as an or-equal and the fact Arrow–Lock was the only other product of the same type, a PVC/mastic lining system.

Jones has not established that B&V negligently misrepresented the lining specification.

### B. *The Claims of Jones Against Hoot*

Jones sues Hoot for breach of contract, common law indemnity and promissory estoppel. All the claims seek recovery from Hoot for Jones' additional expense to install the Linabond co-lining system after Arrow–Lock was rejected.

#### 1. Breach of Contract

Jones alleges Hoot breached the subcontract by not installing a lining system which conformed to the specification in the general contract. Hoot responds the parties agreed the scope of its work under the subcontract was limited to furnishing Ameron products as in its original bid, a limitation which it sought to include in the written subcontract by Exhibit B. Absent such an agreement, the written subcontract required Hoot to furnish a lining system which met B&V's approval.[29] Alternatively, Hoot contends there was no

---

**28.** It would have been clearer if WRA and B&V had put this in the or-equal clause with language like "at this time, the owner is not aware of an equal product," but its absence does not make the specification false.

**29.** The subcontract stated as follows with respect to the scope of work:

 6.2 **SCOPE OF WORK.** All work necessary or incidental to complete **Division 9–**

**Finishes** work for the project in strict accordance with and reasonable [sic] inferable from the Contract Documents and as more particularly, though not exclusively, specified in **09887** [the lining specification] with the following additions or deletions:
. . .
—8 Sets of submittals by 7/26/04. . . .
The other additions or deletions are not material.

contract. In the order of things it is appropriate to take up the existence of the contract first.

■ The choice of law provision in the subcontract specified North Dakota law would govern. The parties agree North Dakota law governs the contract issues under the written subcontract, though there is some disagreement between them on whether North Dakota and Iowa law differ much. Iowa law, however, governs the question of whether a contract existed, for if there was no contract there was no choice of law. *See* Restatement (Second) of Conflict of Laws § 187 cmt. a (it must be "established to the satisfaction of the forum that the parties have chosen the state of the applicable law"). As Hoot's work was to be performed in Iowa under the umbrella of a general contract which adopted Iowa law, Iowa has the most significant relationship to the transaction involved in this case. Under Iowa choice of law rules, Iowa law would govern the contract formation issue. *Nesladek v. Ford Motor Co.*, 46 F.3d 734, 736 (8th Cir.1995)("Federal courts sitting in diversity apply the forum state's conflict of laws rules."); *Smith v. Gould, Inc.*, 918 F.2d 1361, 1363 n. 3 (8th Cir.1990)(Iowa applies the most significant relationship test). The Court will, however, refer to the law of both Iowa and North Dakota where appropriate.

■ An offer and acceptance must express mutual assent to the same thing. *Rick v. Sprague*, 706 N.W.2d 717, 724 (Iowa 2005); *Berg v. Lien*, 522 N.W.2d 455, 456 (N.D.1994). A conditional acceptance, that is, one which expresses a willingness to enter into a contract on terms which differ from the offer, is a rejection of the offer and constitutes a counteroffer which invites acceptance of the modification. *See Rick*, 706 N.W.2d at 724; *Greenberg v. Stewart*, 236 N.W.2d 862, 868 (N.D. 1975); Restatement (Second) of Contracts

§ 59 (hereinafter "Restatement Contracts"); 2 R. Lord, *Williston on Contracts* § 6:13 at 135–138 (4th ed.2007). Under the same principle, if the response to the counteroffer is in turn a conditional acceptance of the counteroffer, the counteroffer is rejected and a new round begins. Generally, mere silence is not acceptance of an offer, *see Prestype, Inc. v. Carr*, 248 N.W.2d 111, 120 (Iowa 1976); Restatement Contracts § 69, but if the offeree having received the offer shows acceptance by performing in whole or part, a contract is formed upon the terms of the offer (or counteroffer as the case may be). 17A Am.Jur.2d *Contracts* § 90 (2004); *see Matrix Properties Corp. v. TAG Investments*, 609 N.W.2d 737, 742 (N.D.2000)(citing Restatement Contracts § 50); *Magnusson Agency v. Public Entity Nat'l Co.-Midwest*, 560 N.W.2d 20, 26 (Iowa 1997).

■ The subcontract purports to be fully integrated. (Ex. 57 at 11). At trial Jones objected to testimony about Exhibit B and Hoot's request that it be included in the subcontract as a violation of the parol evidence rule. The evidence was received subject to this objection. When a contract is fully integrated the parol evidence rule disallows extrinsic evidence to vary or contradict the written contract terms. *See Whalen v. Connelly*, 545 N.W.2d 284, 290 (Iowa 1996); *Gajewski v. Bratcher*, 307 N.W.2d 826, 829 (N.D.1981); *Commercial Trust and Sav. Bank of Storm Lake v. Toy Nat. Bank of Sioux City*, 373 N.W.2d 521, 523 (Iowa App.1985). The parol evidence rule does not bar extrinsic evidence on the issue of whether a written agreement is completely integrated or the meaning of written terms. Restatement Contracts §§ 210(3), 214(a)-(c); *see Felco v. Doug's North Hill Bottle Shop*, 579 N.W.2d 576, 580–81 (N.D.1998); *I.G.L. Racquet Club v. Midstates Builders, Inc.*, 323 N.W.2d 214, 215–16 (Iowa 1982). Moreover, "parol evi-

dence is always competent to show the nonexistence of the purported contract." 29A Am.Jur.2d *Evidence* § 1108 (1994).

 Hoot's bid was solely to install Ameron's T–Lock and Arrow–Lock on an or-equal basis. When Jones accepted the bid it sent its written form standard subcontract to Hoot with a request that Hoot sign and return it. The proposed subcontract required Hoot to provide a lining system as specified in the general contract. Hoot executed the form subcontract and returned it to Jones with the addition of the unit price and construction drawings terms typed on the last page of the form. The unit price in particular was a significant change. Mr. Nath had been warned about the dangers of unit pricing. He double-checked the projected material quantities and discussed the matter with Mr. Jeff Jones to make sure Jones was comfortable with the proposal. Hoot's return of the executed subcontract with the additional terms was therefore both a rejection of the subcontract offered by Jones and a counteroffer.

Prior to Jones' response, Ms. McDurham supplemented the counteroffer by sending Exhibit B to Jones with the request that it be signed and added to the subcontract. From Ms. McDurham's cover sheet requesting that Exhibit B be added to the contract, her follow-up oral request to Mr. Nath, her reference to the parties' course of dealing on the Springfield project, and the text of Exhibit B, it should have been apparent to Jones that Hoot was proposing a further fundamental alteration of the subcontract terms from those offered by Jones.

On August 23, 2004 Hoot received the executed subcontract from Jones with the unit price and construction drawings terms proposed by Hoot, but not Exhibit B. At that point Hoot and Jones did not have a subcontract because Jones had rejected Hoot's counteroffer to add Exhibit B, and in legal effect had counter offered to enter into the subcontract with the price and construction drawings terms but without Exhibit B. Hoot was aware that Exhibit B had not been executed and returned as it had requested. It could at that point have insisted on the return of an executed Exhibit B as a condition of entering into the subcontract. It did not do this. The parties stipulated in the final pretrial order that after receiving the executed subcontract without Exhibit B Hoot sent the subcontract submittals to Jones. (Order on Final Pretrial Conference at 4).[30] Sending the submittals was part of Hoot's performance specified in the subcontract. *See* n. 29 *supra*. By commencing performance Hoot showed acceptance of the subcontract as executed and returned by Jones. Jones therefore has established the existence of the subcontract.

 Hoot contends Mr. Nath's statement to Ms. McDurham that Jones would sign Exhibit B and return it to Hoot was an acceptance of Exhibit B as part of the subcontract, or modified the subcontract to limit the scope of Hoot's work to its bid to install T–Lock and Arrow–Lock. As a threshold matter, this argument depends on the apparent authority of Mr. Nath to contract for Jones. Mr. Nath did not have actual authority to enter into or modify contracts for Jones. Under North Dakota law, ostensible or apparent authority must be proved by clear and convincing evidence. *Weinreis v. Hill,* 700 N.W.2d 692, 695 (N.D.2005). Ostensible or apparent authority results if "the principal intentionally or by want of ordinary care causes or allows a third person to believe the agent" possesses authority. *Id.; see*

---

**30.** Factual stipulations by the parties are conclusive and the Court is bound to enforce them. *Gander v. Livoti,* 250 F.3d 606, 609 (8th Cir.2001).

*Hendricks v. Great Plains Supply Co.,* 609 N.W.2d 486, 493 (Iowa 2000). "Apparent authority must be determined by what the principal does, rather than any acts of the agent." *Hendricks,* 609 N.W.2d at 493.

Jones did not negligently or otherwise do anything to cause or allow Hoot to believe Mr. Nath had the authority to bind Jones to Exhibit B or modify the subcontract. Only Ms. McDurham was in contact with Jones on the subject, and she talked only to Mr. Nath. Any impression of Mr. Nath's authority she might have received came solely from what he said to her. Indeed, the Court doubts Hoot believed Mr. Nath had the authority to agree to Exhibit B. When the parties dealt with each other on the Springfield project Mr. Jeff Jones executed the subcontract for Jones. (Ex. HC 5 at 11). The proposed WRA form subcontract originally tendered by Jones for the WRA lining system had a signature line indicating it was to be executed by Jeff Jones as Jones' CEO. (Ex. 50 at 13). As drafted by Hoot Exhibit B likewise had a signature line for Jeff Jones to execute the document on behalf of Jones. (Ex. HC 1 at 3). Ms. McDurham must have known that in Mr. Nath she was dealing with someone who was essentially her counterpart at Jones. Mr. Hoot is experienced enough not to assume someone in Mr. Nath's position could bind his employer to a major contract modification.

■ Putting aside the apparent authority issue Mr. Nath's statements to Ms. McDurham did not result in an acceptance of Exhibit B. In her fax cover sheet Ms. McDurham specified the manner in which Exhibit B was to be accepted—by execution of the document and return to Hoot to be added to the subcontract. This reflects a mutual intent on the part of Jones and Hoot that their subcontract be written and entire. The common law rule, which both Iowa and North Dakota appear to follow, is that the offeror (here Hoot with respect

to Exhibit B) may prescribe the manner and mode of acceptance. *See Western Tire, Inc. v. Skrede,* 307 N.W.2d 558, 562 (N.D.1981)("The general rule of contracts holds that the offeror can require notice of acceptance in any form that he pleases and may specify the manner in which notice is to be given."); *Lyon v. Willie,* 288 N.W.2d 884, 888 (Iowa 1980)("The party making the offer may prescribe the mode of acceptance, and to constitute a binding contract this method must be followed . . . ." quoting *Breen v. Mayne,* 141 Iowa 399, 403–04, 118 N.W. 441, 443 (1908)); *see Figge v. Clark,* 174 N.W.2d 432, 435 (Iowa 1970); 2 *Williston on Contracts* § 6:12 at 122 (4th ed.2007); 17A Am.Jur.2d *Contracts* § 93 at 116–17 (2004). Jones did not accept Exhibit B in the manner prescribed by Hoot.

Nor did Mr. Nath's statements to Ms. McDurham constitute a subsequent oral modification of the written subcontract as argued by Hoot. (Hoot Post–Trial Brief at 8–9). The discussion between Ms. McDurham and Mr. Nath was not subsequent, it was part of the negotiations which preceded acceptance of the subcontract on or after August 23, 2004. The statutory foundation for the parol evidence rule in North Dakota is NDPC § 9–06–07 which states:

> The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.

*Jorgensen v. Crow,* 466 N.W.2d 120, 123 (N.D.1991)(quoting NDPC § 9–06–07); *see Biteler's Tower Serv., Inc. v. Guderian,* 466 N.W.2d 141, 143 (N.D.1991); *Schue v. Jacoby,* 162 N.W.2d 377, 382 (N.D.1968). The North Dakota Supreme Court has held § 9–06–07

> . . . does not preclude proof of the existence of any separate oral stipulation or agreement as to any matter on which

the written contract is silent, and which is not inconsistent with its terms, if from the circumstances of the case the court infers that the parties do not intend the document to be a complete and final statement of the whole of the transaction between them.

*Putnam v. Dickinson,* 142 N.W.2d 111, 119 (N.D.1966); *see Delzer v. United Bank of Bismarck,* 459 N.W.2d 752, 755 (N.D. 1990); *Schue,* 162 N.W.2d at 382. The written subcontract is not silent on the scope of Hoot's work, it contains a "Scope of Work" provision which required Hoot to complete the work provided for in the general contract lining specification. A separate oral agreement limiting Hoot's work to the installation of the specific lining products it bid would have been inconsistent with the written subcontract terms in this regard. Neither party intended that something as fundamental as the scope of the subcontracted-for work would be left to an oral side agreement, that is why Hoot asked that Exhibit B be made part of the written subcontract. The subcontract's integration clause indicates the parties did intend the written subcontract to be completely integrated: "This Agreement . . . represents the entire and integrated agreement between the parties hereto and supercedes all prior negotiations, representations, or agreements, either written or oral." (Ex. 57 at 11).

Next, Hoot points to the fact the unit price term which Jones did agree to when it returned the executed subcontract called for the contract amount to be based on the amount of liner "installed, welded and tested" and argues since only the Ameron linings are welded the parties agreed the subcontract was limited to the Ameron products in Hoot's bid. The problems here are that Jones did not know a "welded" liner referred only to Ameron's linings, the phrase in which the word appears does not expressly purport to be a limitation on the scope of the subcontract work, the

Court doubts Hoot intended it as such (by its terms the phrase merely describes how Hoot would be compensated, Exhibit B was intended to limit the scope of Hoot's work), and if it did, the reference is very ambiguous and must be construed against Hoot as the drafter. *Kaler v. Kraemer,* 603 N.W.2d 698, 703 (N.D.1999)(citing NDPC § 9–07–19); *see Maxim Technologies, Inc. v. City of Dubuque,* 690 N.W.2d 896, 901 (Iowa 2005).

Finally, the Court understands Hoot to maintain that Jones breached the subcontract by not securing the approval of WRA and B&V to Arrow–Lock as an or-equal and by committing to an or-equal product in breach of the general contract provision that or-equals were not to be ordered unless and until approved. The subcontract did not obligate Jones to secure approval of Arrow–Lock and the alleged breach of the general contract by ordering the Arrow–Lock system was not a breach of the subcontract, nor does it excuse Hoot's performance. The parties were free to contractually allocate the risk, of which both were or should have been aware, that WRA/B&V might not approve the installation of the equivalent lining system bid by Hoot.

The record evidence and contract law principles discussed above compel a finding in Jones' favor on its breach of contract claim against Hoot. By its conduct Hoot accepted the written subcontract without Exhibit B. Mr. Nath's statements to Ms. McDurham about Exhibit B did not result in an acceptance of Exhibit B as part of the subcontract or a modification of the subcontract. Jones did not breach the subcontract. Hoot breached the subcontract by not installing the lining system required by the project owner and engineer. Jones was compelled to complete the project and is entitled to recover its additional expense in doing so which is the

difference between the subcontract amount of $382,074 and the expense to Jones in installing the Linabond co-lining system, $614,881, for contract damages in the amount of $232,807.[31]

### 2. Common Law Indemnity

 No theory of common law indemnity warrants imposing liability on Hoot for the additional expense occasioned to Jones when it was compelled to install the Linabond co-lining system. Iowa law recognizes common law indemnity in four situations:

> "(1) Where the one seeking indemnity has only a derivative or vicarious liability for damage caused by the one sought to be charged.
>
> (2) Where the one seeking indemnity has incurred liability by action at the direction, in the interest of, and in reliance upon the one sought to be charged. Restatement Restitution, Sec. 90.
>
> (3) Where the one seeking indemnity has incurred liability because of a breach of duty owed to him by the one sought to be charged.
>
> (4) Where the one seeking indemnity has incurred liability merely because of failure, even though negligent, to discover or prevent the misconduct of the one sought to be charged."

*Hansen v. Anderson, Wilmarth & Van Der Maaten*, 630 N.W.2d 818, 823 (Iowa 2001)(quoting *C.F. Sales, Inc. v. Amfert, Inc.*, 344 N.W.2d 543, 553–54 (Iowa 1983), quoting in turn *Peters v. Lyons*, 168 N.W.2d 759, 767 (Iowa 1969)). Jones' liability to WRA was not derivative or vicarious. It was based on Jones' contract obligation to WRA. Jones did not incur liability at the direction, in the interests of, or in reliance upon Hoot. This species of indemnity, derived from Restatement (First) of Restitution § 90 (1937)(" § 90"), rarely arises.

The rule "has its most frequent application where a person directs a servant or other agent to act on his account in the seizure of goods or the entry upon land," but applies also "where a person directs an independent contractor to act on his account" or "where a judgment creditor directs a sheriff to take specific goods upon execution."

*Subcliff v. Brandt Engineered Products, Ltd.*, 459 F.Supp.2d 843, 856 (S.D.Iowa 2006)(quoting in part § 90 cmt. a). Clearly, Jones did not incur liability to WRA at Hoot's direction.

The only duty Hoot would have owed to Jones was contractual as just discussed. Lastly, Jones is not liable to WRA because of any failure to discover misconduct on Hoot's part. Again, Jones' liability to WRA is contractual and Hoot engaged in no misconduct.

### 3. Promissory Estoppel

 Jones invokes the equitable doctrine of promissory estoppel on the basis of Mr. Hoot's statements to Mr. Nath about T–Lock and Arrow–Lock being the equal of Linabond's co-lining system when Jones solicited a bid from Hoot. Because Jones has a complete remedy at law for breach of contract there is no reason to resort to equity. In any event, none of the elements of promissory estoppel are present. Those elements are:

> (1) a clear and definite promise; (2) the promise was made with the promisor's clear understanding that the promisee was seeking an assurance upon which the promisee could rely and without which he would not act; (3) the promisee acted to his or her substantial detriment

---

**31.** The Court finds it was reasonable in the circumstances for Jones to subcontract for installation of the Linabond co-lining system on the basis of the bid it had in hand from Graham Construction.

in reasonable reliance on the promise; and (4) injustice can be avoided only by enforcement of the promise.

*Kolkman v. Roth,* 656 N.W.2d 148, 156 (Iowa 2003)(quoting *Schoff v. Combined Ins. Co. of Am.,* 604 N.W.2d 43, 48–49 (Iowa 1999)). "[S]trict proof of all elements" of promissory estoppel is required by the Iowa Supreme Court. See *National Bank of Waterloo v. Moeller,* 434 N.W.2d 887, 889 (Iowa 1989)(citing *Pillsbury Co. v. Ward,* 250 N.W.2d 35, 39 (Iowa 1977)). ·

... A "promise" is "[a] declaration ... to do or forbear a certain specific act." *Black's Law Dictionary* 1213 (6th ed.1990). A promise is "clear" when it is easily understood and is not ambiguous. *See Webster's Third New International Dictionary* 419 (unab. ed.1993). A promise is "definite" when the assertion is explicit and without any doubt or tentativeness. *See id.* at 592.

*Schoff,* 604 N.W.2d at 50–51. The "strict proof" requirement means that whether a statement amounts to a "clear and definite promise" is judged by a "strict standard." *Id.* at 52; *see Kolkman,* 656 N.W.2d at 156.

■ After talking with Ameron's Mr. Pico, Mr. Hoot called Mr. Nath and told him "he had spoken with Ameron and there should be no problem using Ameron's products on the project, Hoot had never had Ameron rejected as an 'or-equal,' and Ameron was considered equal to Linabond in the industry." *Supra* at 995. These statements do not amount to "[a] declaration ... to do or forbear a certain specific act," and were in the nature of an opinion or prediction. *See Schoff,* 604 N.W.2d at 51 (statements which merely convey an impression or understanding of a fact do not constitute a promise). Mr. Hoot, as Mr. Nath must have known, was in no position to make a promise that T–Lock and Arrow–Lock

would be approved as equivalent to the specified Linabond product. Mr. Nath was not seeking assurance from Mr. Hoot. He only asked for a bid. Mr. Nath does not recall what Mr. Hoot told him. He would remember if it had been important. It follows from what was said above that Jones could not have reasonably relied on Mr. Hoot's statements as a clear and definite promise. Finally, justice does not require enforcement of the alleged promise outside of the contractual obligations of Jones to WRA and Hoot to Jones.

### C. The Claims of Jones Against WRA

■ Jones alleges WRA breached the general contract and its incorporated implied covenant of good faith and fair dealing by not approving Arrow–Lock as an or-equal to the Linabond co-lining system or as an essentially equivalent substitute. (Fifth Amended and Substituted Complaint ¶¶ 10, 14, 18). WRA acted through B&V in assessing the Ameron submittals and relied on B&V's recommendation on equality. With respect to the equivalency clauses in the contract, including the specific "or equal" clause in the lining specification, WRA's contractual obligation was limited to objectively assessing in good faith Arrow–Lock as a proposed or-equal. The Court's findings and conclusions with respect to the professional negligence claims against B&V implicitly indicate that WRA did not breach the general contract in its assessment of Arrow–Lock as a proposed or-equal. WRA reasonably relied on the assessment made by B&V which, while not flawless and debatable in its conclusions, was sufficiently objective to conform to the contract requirement. Arrow–Lock was not assessed as a potential substitute, but Jones did not request consideration as a substitute and as noted previously, the Court disagrees with Jones' contention that consideration as a substi-

tute should have been automatic upon rejection of Arrow–Lock as an or-equal.

WRA acted in good faith in exercising its ultimate discretion to determine whether the proposed Arrow–Lock system was the equal of the specified Linabond co-lining system. WRA's Mr. Stowe met with Mr. Jeff Jones, listened to his concerns, asked Mr. Jones for information about Ameron, followed up on Mr. Jones' suggestion that WRA speak with Los Angeles sanitation officials about the Linabond and Ameron systems, and pointedly asked Ms. Kliewer about a change in position on equivalency which caused Ms. Kliewer to defend B&V's decision. All of this evinces good faith on WRA's part in attempting to assure itself that B&V had correctly determined the equivalency issue.

Judgment will be entered in favor of WRA and against Jones on Jones' contract-based claims against WRA.

### D. WRA's Counterclaim Against Jones

WRA counterclaims against Jones for, as the Court understands it, breach of the general contract and the duty of good faith and fair dealing which arose from it. WRA contends it is entitled to recover its "outlay and expense" under the Urban Standards provisions dealing with breach of contract which, it argues, would include its attorney fees and costs in this action. (Ex. 48 at 342–43).

WRA relies on the provision in the Urban Standards which states that by bidding a bidder represents that it has "carefully examined ... the plans, specifications, and all other contract documents; and that the bidder is fully informed concerning the ... character, quality, and quantity of the work to be performed ... as well as the material to be furnished." (Ex. 48 at 318). WRA is critical of Jones for failing to make even a cursory investigation to inform itself of the requirements of the job and specifically as it related to the lining system. It notes Jones never asked any questions about the plans and specifications, did not attend the pre-bid conference, and charges it was motivated only to put in the low bid.

While Jones may have breached the general contract by, in effect, ordering the Arrow–Lock system prior to securing approval of Arrow–Lock as an or-equal, the consequences of that breach have not been visited on WRA. The fact is that once it was clear Arrow–Lock would not be approved, Jones performed the contract by finding another installer to install the specified Linabond co-lining system. Jones did not breach the general contract in any of the ways described in the Urban Standards. Nor does WRA refer to any notice of default and failure to cure, both of which are prerequisites to the recovery of "outlay and expense" under the contract provisions on which WRA relies. (See Ex. 48 at 343–44).

Jones was remarkably uninquisitive about the lining specification and the contract generally, and may well have been negligent in its own lack of prudence (an issue the Court need not determine), but any failures in these regards did not, in the Court's judgment, amount to a breach of Jones' duty of good faith and fair dealing under the general contract.

Judgment will be entered in favor of Jones and against WRA on WRA's counterclaim against Jones.

### E. The Cross–Claims of WRA against B&V

In Counts I through V of the cross-claim WRA sought contractual indemnity from B&V to the extent Jones may have been entitled to recover from WRA on any of the substantive claims Jones pleaded against WRA. These counts are mooted by the Court's findings that Jones is not entitled to recover damages against WRA.

In Count VI of the cross-claim WRA alleges B&V breached the professional services contract between WRA and B&V by not defending and indemnifying WRA against Jones' claims. WRA seeks recovery of its attorney's fees and costs. In the August 8 ruling the Court held that the indemnification and hold harmless provision in the professional services contract on which Count VI is founded was inapplicable to Jones' claims against WRA. The Court concluded

> ... [T]he [indemnification and hold harmless provision] unambiguously requires B&V to defend against and indemnify all claims and damages asserted against WRA "by reason of personal injury ... and property damages" resulting from B&V's negligence. Jones seeks only economic damages, not property damage and there has been no injury. The indemnity provision does not require Jones [sic] to indemnify claims for economic damages sustained by contractors and subcontractors unrelated to personal injury or property damage.

(August 8 ruling at 53, quoting Ex. 197 at 17). Accordingly, the Court granted B&V's motion for summary judgment on WRA's cross-claims for contractual indemnity in Count VI. (*Id.* at 55). In connection with the summary judgment proceedings WRA had argued it might nonetheless be able to recover common law indemnity. As WRA had only pleaded contractual indemnity the Court did not consider the issue ripe, and made its ruling "without prejudice to further consideration of any claim for common law indemnity if properly presented." (*Id.*) In the final pretrial order WRA preserved the right to seek common law indemnity against B&V if WRA was found liable to Jones. (Order on Final Pretrial Conference at 38, 42). WRA has not been found liable to Jones. The Court therefore considers any common law indemnity claim under Count VI to also be moot.

Judgment will be entered in favor of B&V and against WRA on WRA's cross-claims against B&V.

### F. *The Cross–Claim of B&V Against Hoot and Counterclaim against Jones*

B&V cross-claimed against Hoot and counterclaimed against Jones pleading negligence, seeking an allocation of fault under Iowa's comparative fault statute, Iowa Code ch. 668, and contribution consistent with the allocation of any fault to Hoot and Jones. As B&V has not been found at fault its cross-claim and counterclaim are moot. There would in any event be no basis to find that any negligence on Hoot's part was a proximate cause of any damages claimed by Jones. As a matter of law Jones would also be entitled to judgment on B&V's counterclaim for contribution on Hoot's claims against B&V for lack of any common liability to Hoot for Hoot's damages under its negligence claim against B&V. (*See* August 8 ruling at 39–40).

Judgment will be entered in favor of Hoot and Jones and against B&V on B&V's cross-claim against Hoot and counterclaim against Jones.

### G. *Motions for Judgment as a Matter of Law by WRA and Hoot*

WRA and Hoot have filed post-trial motions for judgment as a matter of law [211, 212] seeking judgment of dismissal on Jones' claims against them. Fed.R.Civ.P. 52(c). The motions will be denied.

### III.

### CONCLUSIONS OF LAW

1. Jones has established its claim in the Fifth Amended and Substituted Complaint of breach of contract against Hoot and is entitled to judgment against Hoot in the amount of $232,807. Jones has not

established any of its other claims against WRA, Hoot and B&V in the Fifth Amended and Substituted Complaint and judgment should be entered dismissing the other claims in the complaint.

2. Jones is entitled to judgment on WRA's counterclaim for "outlay and expense." B&V is entitled to judgment dismissing WRA's cross-claims against it.

3. Hoot has not established any of the claims in its third-party complaint against B&V and judgment should be entered dismissing the third-party complaint.

4. Judgment should be entered dismissing the cross-claim of B&V against Hoot and counterclaim of B&V against Jones.

## IV.

### ORDERS

The Clerk shall enter judgment substantially as follows:

IT IS ORDERED, ADJUDGED AND DECREED that judgment in the amount of $232,807 is entered in favor of plaintiff John T. Jones Construction Company and against defendant Hoot General Construction Company, Inc. plus interest at the rate and accruing as provided by law on the claim in plaintiff's Fifth Amended and Substituted Complaint against Hoot General Construction Company, Inc. for breach of contract. Judgment is entered in favor of defendants Des Moines Metropolitan Wastewater Reclamation Authority, Hoot General Construction Company, Inc., and Black & Veatch Corp. and against plaintiff John T. Jones Construction Company on all other claims and in the Fifth Amended and Substituted Complaint and said claims are dismissed.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that judgment is entered in favor of counterclaim defendant John T. Jones Construction Company and against counterclaimant Des Moines Metropolitan Wastewater Reclamation Authority on its counterclaim and said counterclaim is dismissed.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that judgment is entered in favor of cross-claim defendant Black & Veatch Corp. and against cross-claim plaintiff Des Moines Metropolitan Wastewater Reclamation Authority on its cross-claim and said cross-claim is dismissed.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that judgment is entered in favor of third-party defendant Black & Veatch Corp. and against third-party plaintiff Hoot General Construction Company, Inc. on its third-party complaint and said third-party complaint is dismissed.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that judgment is entered in favor of cross-claim defendant Hoot General Construction Company, Inc. and against cross-claim plaintiff Black & Veatch Corp. on its cross-claim and said cross-claim is dismissed; judgment is entered in favor of counterclaim defendant John T. Jones Construction Company and against counterclaimant Black & Veatch Corp. on its counterclaim and said counterclaim is dismissed.

The post-trial Fed.R.Civ.P. 52(c) motions for judgment as a matter of law [211, 212] filed by Des Moines Metropolitan Wastewater Reclamation Authority and Hoot General Construction Company, Inc. are **denied**.

At trial the Court reserved attorney fee claims for posttrial motions. The Court's substantive rulings on the parties' various claims may subsume some such motions, but any party claiming the right to attor-

ney fees may do so by motion in conformity with Fed.R.Civ.P. 54 and LR 54.1.

IT IS SO ORDERED.